### JACKSON COUNTY BANK
v.
### FORD MOTOR CREDIT COMPANY.
### No. 79–2042–NE–CV.

United States District Court,
M. D. Tennessee,
Northeastern Division.

Jan. 3, 1980.

Amended Order Jan. 8, 1980.

---

Thomas P. Kanaday, Jr., Daniel W. Small, Farris, Warfield & Kanaday, Nashville, Tenn., for plaintiff.

John S. Bryant, Frank A. Berry, Jr., Bass, Berry & Sims, Nashville, Tenn., for defendant.

## MEMORANDUM

MORTON, Chief Judge.

This is a suit by a Tennessee resident against a Delaware corporation with its principal place of business in Michigan. This court has jurisdiction pursuant to 28 U.S.C. § 1332. The case was submitted on stipulation of facts. A supplemental stipulation was tendered to the court subject to the objection of defendant as to relevancy. This court now determines that such supplemental stipulation is relevant, and the facts

contained therein have been authenticated by the signature of the trial judge and are part of this record.

The stipulated facts are:

(1) The plaintiff Jackson County Bank is a Tennessee banking corporation with its principal office in Gainesboro, Tennessee. Plaintiff is a creditor of Vinson Ford, Inc.

(2) The defendant Ford Motor Credit Company ("Ford Credit") is a Delaware corporation with its principal offices located in Dearborn, Michigan. Defendant extended credit to Vinson Ford, Inc., to finance its inventory of new motor vehicles.

(3) Vinson Ford, Inc. ("Vinson Ford") is a Tennessee corporation that had its principal offices in Gainesboro, Tennessee. Vinson Ford was a franchised dealer of Ford Motor Company. Vinson Ford was incorporated on June 24, 1974, and on October 21, 1974, Ford Credit entered into an agreement to extend floor plan financing for the Vinson Ford new car inventory.

(4) As part of the application for Ford Credit floor plan financing, Vinson Ford, on August 29, 1974, executed a security agreement granting to Ford Credit a security interest in certain assets of the dealership, including its motor vehicle inventory.

(5) On October 30, 1974, Ford Credit filed with the Tennessee Secretary of State a duly executed UCC–1 financing statement giving notice of its security interest in the assets of Vinson Ford, Inc. The description of collateral printed on this form describes a wide variety of dealership assets, but the following language was typewritten on the form: "The present amount of indebtedness is $100,000 and is secured by motor vehicles only." Ford Credit claims no security interest in any dealership assets except motor vehicles.

(6) On October 30, 1974, when the Ford Credit financing statement was recorded, Vinson Ford was not indebted to Ford Credit in any amount. The "amount of present indebtedness" was stated on the Ford Credit financing statement for the purpose of computing the Tennessee transfer tax, and was determined by a "rate of travel" formula used internally by Ford Credit for planning purposes. This amount was intended to approximate the amount of indebtedness necessary to finance the purchase of a 45-day inventory of new cars for Vinson Ford, based upon available market information. Neither Ford Credit nor Vinson Ford considered this $100,000 guideline as an amount above which Ford Credit would refuse to extend further financing, and both recognized that from time to time the floor plan indebtedness of Vinson Ford might exceed $100,000. No maximum indebtedness in excess of which Ford Credit would refuse to loan money was established.

(7) On or about July 13, 1976, Vinson Ford and Jackson County Bank entered into a Security Agreement in which Vinson Ford was the debtor and plaintiff was the secured party. Vinson Ford granted Jackson County Bank a security interest in:

All equipment of every type and nature now owned and hereafter acquired. All inventory of every type and nature now owned and hereafter acquired, including parts and used car floor plan.

On August 2, 1976, Jackson County Bank filed a financing statement covering the property described in the July 13, 1976, Security Agreement. The description of the collateral contained in the bank's Financing Statement was identical to the description in the bank's Security Agreement.

(8) On February 5, 1979, Ford Credit terminated its floor plan financing agreement with Vinson Ford after several dealership checks payable to Ford Credit were returned by Jackson County Bank for insufficient funds. On that date, Vinson Ford executed a voluntary surrender of its motor vehicle inventory to Ford Credit.

(9) By letter of February 12, 1979, Ford Credit made demand on Vinson Ford for payment of its outstanding floor plan indebtedness in the principal amount of $610,-237.47.

(10) On February 13 or 14, 1979, Ford Credit decided to repossess and liquidate the Vinson Ford motor vehicle inventory. Removal of the vehicles to Nashville by

motor truck convoy was begun immediately.

(11) On February 15, 1979, representatives of plaintiff Jackson County Bank, including James Birdwell, the bank president, and its lawyer, met with representatives of Ford Credit and its lawyer to discuss the disposition of the Vinson Ford used car inventory, to which both the bank and Ford Credit asserted a claim. During discussions at that meeting, Ford Credit advised the bank representatives that it intended to dispose of some of the new cars by sale to Ford Motor Company under a repurchase obligation upon the manufacturer, and that it intended to sell the remainder of the new cars as soon as possible to other Ford dealers. Although Ford Credit advised that sales of repossessed new cars would begin as soon as possible, no specific date after which these sales would begin was discussed at this meeting or at any other time. The parties agreed that the used cars remaining at the dealership should be sold in bulk as soon as possible to the purchaser submitting the highest bid, and that the proceeds from the sale of these used cars would be held in escrow until the dispute over the money could be resolved.

(12) Pursuant to the agreement reached at the February 15 meeting, both the bank and Ford Credit secured bids from prospective purchasers for the used cars. The bid obtained by Ford Credit was higher than the bid obtained by plaintiff bank, and the parties agreed that these cars should be sold to the highest bidder. The cars were sold to the highest bidder for a net purchase price of $19,676.00. This money remains in escrow pursuant to the agreement of the bank and Ford Credit.

(13) Ford Credit never sent to plaintiff bank written notice of its intent to dispose of the Vinson Ford motor vehicle inventory by private sale.

(14) Vinson Ford was placed into a state court receivership in March, 1979.

(15) Following Ford Credit's termination of its floor plan financing agreement with Vinson Ford, Ford Credit took possession of the dealership's new car inventory, consisting of 64 new or demonstrator vehicles. These cars were transported to Nashville by motor truck convoy. Any cars charged to Vinson Ford but in transit from the factory to the dealership were returned to Ford Motor Company for full credit against the Vinson Ford indebtedness to Ford Credit.

(16) Approximately eighteen of the new cars repossessed by Ford Credit have been repurchased by Ford Motor Company pursuant to a contractual obligation imposed on Ford Motor Company. Ford Motor Company paid the full dealer's wholesale price for these vehicles, less a rebate of approximately 2 percent that had been paid by Ford Motor Company to Vinson Ford when these cars were purchased from the factory. Ford Credit generally prefers to sell as many cars back to Ford Motor Company under this repurchase agreement as possible, because, in the experience of Ford Credit, the price Ford Motor is required to pay is higher than the price generally obtainable in other markets.

(17) The majority of the new cars that were not subject to the repurchase obligation of Ford Motor Company were sold to other Ford dealers. Following the repossession of the Vinson Ford inventory, Ron Crabtree, Nashville branch office manager for Ford Credit, wrote letters to approximately seventy Ford dealers in the geographical area served by the Nashville branch office enclosing a list of the vehicles held for sale and inviting them to submit bids for these cars. Crabtree also wrote to the branch office managers in Louisville, Memphis, and Chattanooga to request assistance in selling some of these vehicles to Ford dealers in their areas. The vehicles sold to other Ford dealers were sold to the dealers submitting the highest bid.

(18) A few vehicles which had been used as demonstrators or had been damaged and therefore could not be sold as new cars were sold to the highest bidder at the Nashville auto auction.

(19) The reduced public demand for new cars during the spring and summer of 1979, and the resulting high levels of inventory

maintained at that time by many Ford dealers, made the disposition of the Vinson Ford inventory take a longer period of time than otherwise would have been anticipated. Only a very few vehicles remain unsold at this time, and they are expected to be sold within the next few weeks.

(20) A "control log" indicated the disposition of the individual new vehicles repossessed by Ford Credit from Vinson Ford. Those vehicles bearing the notation "transit" in the left column were in transit when financing was terminated, and were returned for full credit to Ford Motor Company. Those vehicles indicated by the notation "OK" in the left margin were approved for return to Ford Motor Company for full credit less the dealer rebate paid to Vinson Ford. The disposition of the remaining vehicles, including the date sold, the identity of the purchaser, the price paid, and any resulting loss to Ford Credit appears on this form with respect to all new vehicles that have been sold to date.

(21) Except for its failure to send notice to the debtor and Jackson County Bank, the manner of disposing of the Vinson Ford inventory is in compliance with the procedures customarily followed by Ford Credit when it becomes necessary to liquidate a dealer's motor vehicle inventory.

(22) Although a final accounting of all credits and expenses is not now available, Ford Credit now estimates that its deficiency following liquidation of the Vinson Ford motor vehicle inventory will be approximately $70,000.00.

(23) The present outstanding indebtedness of Vinson Ford to plaintiff bank is $219,585.83. This debt will be reduced by a maximum of approximately $55,000.00, if the bank is able to liquidate all of its other collateral of Vinson Ford, resulting in an estimated minimum indebtedness of $164,-585.83.

(24) Vinson Ford's credit line was increased by Ford Credit from $100,000.00 to $150,000.00 sometime between June 1975 and June 1976. It was increased by Ford Credit again between June 1976 and January 1977 to $255,000. No amendment was made to Ford Credit's Financing Statement at this time, nor did Ford Credit pay any state transfer tax on the increase.

(25) The following table indicates the pattern of Vinson Ford's indebtedness to Ford Credit between October 30, 1974, and September 1979:

| Month | Year | Amount Outstanding | Credit Line | Amount on Which Tax Paid |
|---|---|---|---|---|
| October | 1974 | –0– | $100,000 | $100,000 |
| November | 1974 | $156,800 | 100,000 | 100,000 |
| December | 1974 | 110,100 | 100,000 | 100,000 |
| January | 1975 | 214,600 | 100,000 | 100,000 |
| February | 1975 | 231,200 | 100,000 | 100,000 |
| March | 1975 | 228,300 | 100,000 | 100,000 |
| April | 1975 | 228,600 | 100,000 | 100,000 |
| May | 1975 | 300,860 | 100,000 | 100,000 |
| June | 1975 | 298,400 | 100,000 | 100,000 |
| July | 1975 | 216,076 | 100,000 | 100,000 |
| August | 1975 | 216,880 | 100,000 | 100,000 |
| September | 1975 | 226,070 | 100,000 | 100,000 |
| October | 1975 | 273,600 | 100,000 | 100,000 |
| November | 1975 | 275,560 | 100,000 | 100,000 |
| December | 1975 | 197,000 | 150,000 | 100,000 |
| January | 1976 | 220,250 | 150,000 | 100,000 |
| February | 1976 | 285,600 | 150,000 | 100,000 |
| March | 1976 | 328,400 | 150,000 | 100,000 |
| April | 1976 | 277,000 | 150,000 | 100,000 |
| May | 1976 | 206,600 | 150,000 | 100,000 |
| June | 1976 | 240,000 | 150,000 | 100,000 |
| July | 1976 | 271,760 | 150,000 | 100,000 |
| August | 1976 | 337,250 | 150,000 | 100,000 |
| September | 1976 | 210,000 | 150,000 | 100,000 |
| October | 1976 | 121,700 | 150,000 | 100,000 |
| November | 1976 | 134,400 | 150,000 | 100,000 |
| December | 1976 | 120,300 | 225,000 | 100,000 |
| January | 1977 | 174,000 | 225,000 | 100,000 |
| February | 1977 | 117,300 | 225,000 | 100,000 |
| March | 1977 | 187,500 | 225,000 | 100,000 |
| April | 1977 | 209,300 | 225,000 | 100,000 |
| May | 1977 | 299,000 | 225,000 | 100,000 |
| June | 1977 | 298,000 | 225,000 | 100,000 |
| July | 1977 | 360,400 | 225,000 | 100,000 |
| August | 1977 | 273,800 | 225,000 | 100,000 |
| September | 1977 | 415,100 | 225,000 | 100,000 |
| October | 1977 | 352,700 | 225,000 | 100,000 |
| November | 1977 | 344,800 | 225,000 | 100,000 |
| December | 1977 | 246,000 | 225,000 | 100,000 |
| January | 1978 | 372,600 | 225,000 | 100,000 |
| February | 1978 | 447,000 | 225,000 | 100,000 |
| March | 1978 | 436,000 | 225,000 | 100,000 |
| April | 1978 | 377,000 | 225,000 | 100,000 |
| May | 1978 | 368,000 | 225,000 | 100,000 |
| June | 1978 | 284,000 | 225,000 | 100,000 |
| July | 1978 | 278,000 | 225,000 | 100,000 |
| August | 1978 | 243,700 | 225,000 | 100,000 |
| September | 1978 | 301,650 | 225,000 | 225,000 |
| October | 1978 | 368,200 | 225,000 | 225,000 |
| November | 1978 | 464,400 | 225,000 | 225,000 |
| December | 1978 | 541,700 | 225,000 | 225,000 |
| January | 1979 | 616,300 | 225,000 | 225,000 |
| February | 1979 | 498,400 | 225,000 | 225,000 |
| March | 1979 | 397,400 | 225,000 | 225,000 |
| April | 1979 | 339,700 | 225,000 | 225,000 |
| May | 1979 | 241,200 | 225,000 | 225,000 |
| June | 1979 | 202,000 | 225,000 | 225,000 |
| July | 1979 | 166,000 | 225,000 | 225,000 |
| August | 1979 | 161,300 | 225,000 | 225,000 |
| September | 1979 | 155,300 | 225,000 | 225,000 |

(26) Documents were prepared by Ford Credit at the time of Vinson Ford's application for wholesale new car floor plan financing in September and October 1974.

(27) At the times pertinent hereto, plaintiff Jackson County Bank had actual knowledge that Ford Credit was engaged in floor plan financing of the new car inventory of Vinson Ford. Ford Credit learned of Jackson County Bank's claimed security interest through its periodic searches of UCC filings.

(28) At the same time that Ford Credit filed the October 30, 1974, Financing Statement, it filed a document entitled "Protest." The document registered Ford Credit's resistance to the application of the Tennessee transfer tax to its filing of financing statements. The "Protest" was a statement signed by a Ford Credit employee. It contained the declaration that the amount of indebtedness was $100,000. The Protest is not a matter of public record.

(29) As it was in 1974, it is today Ford Credit's policy to pay the filing fee and transfer tax on the financing statements filed on its behalf. Ford Credit's dealers are not charged for the tax.

(30) On September 5, 1978, Ford Credit filed an amendment ("the Amendment") to its Financing Statement. The Amendment declared: "Amend amount of indebtedness to $225,000.00." The transfer tax was paid on the difference between the original amount ($100,000) and the new amount ($225,000). A sworn Statement of Indebtedness was also filed that declared the amount of indebtedness to be $225,000.

(31) Ford Credit Procedure No. 841/400-499 is Ford Credit's guideline concerning how to file security agreements and financing statements in Tennessee. It also sets forth instructions to its personnel as to how to compute and pay the Tennessee transfer tax.

(32) Ford Credit Procedure No. 331 governs the handling and winding up of defaulted dealers. These dealers are referred to by Ford Credit as "status" dealers.

(33) New current model vehicles are generally returned to Ford Motor Company for credit against the sales price to the dealer or sold at private sale to other Ford Motor Company dealers. Every attempt is made by Ford Credit to sell the vehicles in bulk. Few vehicles, if any, are sold by Ford Credit individually at the Nashville or other "auto auctions," or to others.

(34) Many of the new vehicles were returned to Ford Motor Company for credit against the purchase price to Vinson Ford. However, Ford Motor Company was not obligated to repurchase so-called "new and unused" vehicles until Vinson Ford "resigned" its dealership franchise. Nor did Ford Motor Company repurchase such vehicles until after Vinson Ford "resigned." Vinson Ford's letter of resignation is dated February 25, 1979, but Ford Credit contends that it was not received until August 1979. With respect to these units there was no bidding for the sale of the vehicles.

(35) Ford Motor Company informed Ford Credit in February that its dealers in the "Louisville district" had committed to take a large number of cars from Vinson Ford. Subsequently, those dealers refused to accept them.

(36) Ford Credit did not send written notice to Vinson Ford of the date after which it would commence disposing of Vinson Ford's new and demonstrator cars at private sale.

(37) Ford Credit did not send notice to Jackson County Bank or to Vinson Ford of the date after which it would dispose of Vinson Ford's used cars at private sale.

Three questions are presented for decision:

(1) the effect of the insertion on the Financing Statement of the following phrase: "The present amount of the indebtedness is $100,000.00 and is secured by motor vehicles only.";

(2) the effect of the failure of defendant to pay the statutory tax as required by the statutes of the state of Tennessee; and

(3) whether the sales of the new car inventory conducted by defendant Ford meet the statutory standard of commercial reasonableness.

## FINANCING STATEMENTS

■ The security agreement from Vinson to Ford granted a security interest in certain assets including the motor vehicle inventory. The printed form financing statement as filed with the State gave notice of the existence of a security interest in such assets but contained in addition thereto the following typewritten notation: "The present amount of indebtedness is $100,000.00 and is secured by motor vehicles only." Thereafter, in September 1978, the above statement was amended to the sum of $225,000. However, by instrument dated July 13, 1976, a security interest in the same assets was granted to plaintiff. A financing statement giving notice thereof was filed with the State on August 2, 1976.

The filing of a financing statement gives notice to the world that a creditor is asserting a security interest in certain assets. Tennessee Code Annotated § 47–9–402 and comments thereunder. Thus, any interested person dealing with the debtor can make such inquiry as desired concerning the status of the arrangement between the debtor and secured creditor. Certain courts have determined that where superfluous information is placed on a financing statement giving the amount of indebtedness or limiting the type of security such creditors are estopped from establishing the true amount of the indebtedness of the true type of security. See In Re HGS Technical Associates, Inc., 14 UCC Rep.Serv. 237 (E.D.Tenn. 1972), aff'd, 14 UCC Rep.Serv. 47, (E.D. Tenn.1973); James Talcott v. Franklin National Bank, 10 UCC Rep.Serv. 11 (Minn. 1972); Georgia-Pacific Corp. v. Lumber Products Co., 25 UCC Rep.Serv. 1475 (Okla. 1979). Contra, Genn v. CIT Corp., 40 Md. App. 516, 392 A.2d 1135, 25 UCC Rep.Serv. 1176 (1978). This court need not analyze these holdings in view of the language inserted in this case. The phrase "present indebtedness" clearly implies that additional indebtedness in the future may come into being. The clear import of this wording is not a limitation of the amount contemplated by the parties as an outer limit on the indebtedness for the future. The word "present" connotes that there may be a future indebtedness exceeding the stated amount. The same reasoning applies to the inserted words concerning security. Thus, this court determines that the financing statement as filed by Ford was notice to the world of such nature that inquiry as to the amount of indebtedness and extent of the security was mandated. Of interest, but not controlling, is the fact that plaintiff was aware that a financing arrangement existed between Vinson and Ford. However, despite this knowledge plaintiff did not examine the records to determine the existence of filed financing statements nor did plaintiff make an inquiry of Ford as to the status of the arrangement. Thus plaintiff did not rely on the financing statement as filed.

## FAILURE TO PAY TAX

■ The privilege taxes for doing business in the State of Tennessee from the state's inception have been enacted by the legislature in specified catagories with various penalties for noncompliance. As a part of the general revenue law of the state, chapters 40 through 43 of Title 67 became law. Some of the privilege taxes had their base in the 1937 Revenue Act which in turn was derived from the Act of 1909. Chapter 40 sets forth the definitions of terms, exemptions, and penalties for violation of the revenue laws delineated in chapters 40 through 43. Chapter 41 lists the privileges taxed by the state only. Chapter 42 defines privileges taxable by state and local authorities. Chapter 43 deals with the administration of the general revenue law. T.C.A. § 67–4102, Item S(b), a portion of chapter 41, provides for the payment of a tax of 10 cents on each $100 or major fraction thereof of indebtedness evidenced by mortgages, deeds of trust, financing statements, etc., under the Uniform Commercial Code (no tax on the first $2,000) prior to the public recording of the instrument. This section does not require that the instrument proffered for recording reflect the amount of the indebtedness. However, the recording official is mandatorily required to determine the value of the property covered by

the instrument prior to recordation. This requirement may be met if the maximum amount secured is stated in the instrument proffered for recording or in a sworn affidavit of the owner of the proffered instrument. The violation of this section subjects the owner of the instrument proffered for recording and recorded to a criminal prosecution as a misdemeanor, with a recurring penalty. T.C.A. § 67–4012.

The defendant, Ford Motor Credit Corporation, filed its financing statement on October 30, 1974, and paid tax on the sum of $100,000. Plaintiff bank filed its financing statement on August 2, 1976. Between November 1974 and August 2, 1976, the indebtedness due Ford secured by its security agreement ranged from a low of $110,100 to a high of $328,400. No additional tax was paid on the amount of the indebtedness in excess of $100,000. From August 1976 until September 1978, the maximum indebtedness due Ford was $447,000. In September 1978, Ford filed a supplemental affidavit stating the indebtedness secured by its security agreement was $225,000. An amended financing statement was permitted to be recorded on this representation. At that time, i. e., when the affidavit and amended financing statements were filed, the indebtedness was $301,650, and later reached a maximum of $616,300.

The recording of the financing statement on October 10, 1974, was based on the representation that the debt was or would be $100,000. Tax was paid on this amount. As stated above, this condition remained the same on August 2, 1976, when plaintiff recorded its financing statement. What is the result of the failure to pay the Tennessee privilege tax on Ford's standing in this court with regard to its claim of a security interest in excess of $100,000?

In addressing the question in relation to taxes imposed by the General Revenue Act of 1937 and its predecessor, the Tennessee courts have ruled adversely to Ford. It will be helpful to examine the underlying rationale of the Tennessee cases.

In *Stevenson v. Ewing*, 87 Tenn. 46, 9 S.W. 230 (1888), a real estate broker sought to recover a commission on a sale although he had not paid the privilege tax in force at the time of the transaction. In holding that the broker was prohibited from maintaining the suit, the court looked to the privilege tax statute then in effect, Public Acts of 1885, Chapter 1, § 46. The court concluded that the statute contained an express prohibition against engaging in the privileged business without first paying the assessed tax and obtaining the necessary license.

In stating the rationale upon which a prohibition could be based, the court found that the prohibition could be *express* within the statute, or *implied*. Grounds for the implied prohibition were stated to be:

(1) an expression of legislative intent to protect the "public from fraud in contracts, or the promotion of some object of public policy . . . ."; or

(2) the imposition of a "recurring penalty, repeated as often as the offending party may have dealings [in the privileged business]." 9 S.W. at 231.

In the *Stevenson* case, *supra*, and in subsequent cases holding that a contract is unenforceable by reason of failure to pay a privilege tax, the Tennessee courts have relied on the particular provisions of the privilege tax statutes then in effect. As successive statutes were enacted, the continuing vitality of the prohibition, derived from statutory construction based on one of the propositions cited in *Stevenson, supra*, as supporting an express or implied prohibition, has been demonstrated.

In the case of *Wright v. Jackson Construction Co.*, 138 Tenn. 145, 196 S.W. 488 (1917); *rev'd on other grounds, sub nom. Chalker v. Birmingham & Northwestern Railway Co.*, 249 U.S. 522, 39 S.Ct. 366, 63 L.Ed. 748 (1919), the Tennessee Supreme Court held that payment of the privilege tax after the privilege had been exercised did not give a right to maintain a suit with reference to transactions occurring before the tax was paid. The privilege tax statute then in force was contained in the Public Acts of 1909, chapter 479. In reaching its

holding, the Court made express reference to the recurring penalty provision of the Act of 1909, which provided:

Section 16 . . . it is hereby declared a misdemeanor for exercising any of the foregoing privileges without first paying the taxes prescribed for the exercise of the same, and all parties so offending shall be liable to a fine of not less than $10.00 nor more than $50.00 for each day such privilege is exercised without license . . ..

196 S.W. 490. In citing the penalty provision of the Act, it appears that the Court acted in conformity with the propositions supporting an implied prohibition as recited in *Stevenson, supra.* According to the older rationale, if the legislature imposes a recurring penalty, then the appropriate inference is that the legislature was prohibiting contracts made before payment of the privilege tax.

In the case of *Anderson v. Sanderson*, 25 Tenn.App. 425, 158 S.W.2d 374 (1942), the privilege tax provisions of Public Acts of 1937, chapter 108, (successor to the Act of 1909) were considered to determine whether the prohibition continued. In concluding that the prohibition carried forward in the new act, the court reviewed the penalty provisions of the act which "made it unlawful and a misdemeanor . . . for any person to exercise any of the privileges made taxable by that act before complying with its provisions." 158 S.W.2d at 375. The court noted that prior case law was based on "similar statutes." The rationale supporting a prohibition against maintaining a suit when the privilege tax had not been paid is in agreement with *Wright* and *Stevenson, supra. See also Bush Building Co. v. Manchester,* 189 Tenn. 203, 225 S.W.2d 31 (1949).

The penalty provision of the 1937 Act is presently codified in T.C.A. § 67–4012 and provides:

It shall be unlawful for any person to exercise any of the privileges made taxable by chapters 40 to 43, inclusive, of this title before complying with the provisions thereof. Any one exercising any of said privileges without first paying the tax or without complying therewith shall be guilty of a misdemeanor and liable for a fine of not less than five dollars ($5.00) for each day such privilege is exercised without a license, which fine shall be in addition to any other penalties herein imposed.

Since 1937, the legislature has periodically removed many occupations and privileges from the General Revenue Law, chapters 40 to 43, inclusive, and dealt with them separately. However, it has left within the purview of that law those taxes which depend upon self-disclosure, i. e., those items of such a nature that business and other tax returns would not readily reflect violation of the statute. Realizing the harshness of the rule that a violating party will be rejected by the courts, the legislature enacted an escape route. Section 67–4015 of Tennessee Code Annotated provides that contracts made in violation of provisions of chapters 40 to 43, inclusive, will not be invalid or unenforceable in court if, prior to adjudication in court, the violator pays double the tax due at the time the contract was made, and in addition, the recurring daily penalty provided in the criminal statute, T.C.A. § 67–4012.

The defendant Ford did not meet the requirements of the escape statute.

Thus it clearly appears that Ford paid tax on a $100,000 debt prior to the filing of the plaintiff's financing statement. The debt it seeks to assert in this court and for which it seeks affirmative relief by way of judicial decree is far in excess of the $100,000 figure. Since it did not meet the statutory mandate nor comply with the relief provisions of the escape statute, it necessarily follows that any contract indebtedness in existence prior to and on August 2, 1976, was an illegal claim on which it had not paid the required tax. Thus, as of August 2, 1976, the date the plaintiff filed a financing statement evidencing a legal debt, Ford's legal debt was not in excess of $100,000, and its priority must be limited to that amount. Keeping in mind that this is a diversity case, this determination is man-

dated by the laws of the State of Tennessee. Therefore, this court will not lend itself to the enforcement of the illegal claim of Ford. The subsequent amendment and concurrent payment of tax to the extent of $225,000 by Ford does not change the foregoing determination, since an amendment to an illegal contract which does not comply with the Tennessee escape statute, T.C.A. § 67–4015, does not legitimate the illegality. Thus this court holds that Ford's priority is limited to the original $100,000 amount as reflected by the financing statement on which the tax was legally paid. All recovery in excess of the $100,000 amount shall inure to the plaintiff until its debt as reflected by its statutorily-perfected claim is satisfied.

### WERE THE SALES OF THE NEW CAR INVENTORY COMMERCIALLY REASONABLE?

T.C.A. § 47–9–504 defines the rights of a secured party to sell collateral after default. The pertinent language is:

> Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms *but every aspect of the disposition including the method, manner, time, place and terms must be commercially responsible.* [Emphasis supplied.]

T.C.A. § 47–9–504(3). In addition, reasonable notification of the time after which a private sale or other intended disposition is to be made shall be sent to the debtor and to other creditors who are known to the seller as having filed a financing statement or known to have a security interest in the collateral. *Id.*

In some respects a definition of what is a reasonably commercial sale appears in T.C.A. § 47–9–507. The pertinent language is:

> If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of

property sold he has sold in a commercially reasonable manner.

T.C.A. § 47–9–507(2).

The burden of proving compliance with the statutes is on the seller. *Investors Acceptance Co. v. James Talcott, Inc.,* 61 Tenn.App. 307, 454 S.W.2d 130 (1969), *cert. denied, id.* (1970); *Mallicoat v. Volunteer Finance and Loan Corp.,* 57 Tenn.App. 106, 415 S.W.2d 347 (1966). The defendant accepts this principal of law.

The evidence before the court reveals that on February 5, 1979, Ford terminated its financing agreement with the debtor Vinson. On that date, Vinson executed a voluntary surrender of its entire vehicle inventory. After default Ford, on or after February 13 or 14, 1979, repossessed the inventory of Vinson. By agreement between plaintiff and Ford, the used car inventory was sold and that portion of the inventory is not at issue in this case. During the discussion of the sale of the used car inventory on February 15, 1979, Ford advised plaintiff it intended to dispose of some of the new cars by sale to Ford Motor Company under a repurchase agreement between the motor company and Vinson and to sell the remainder as soon as possible to other Ford dealers. No specific date after which the sales would be made was mentioned. No written notice of intent to sell at private sale was sent by Ford to plaintiff. Ford Motor Company repurchased eighteen cars at full wholesale dealer prices, less the two percent rebate previously paid by the motor company to Vinson. Demonstrator cars or slightly damaged cars were sold to the highest bidder at the Nashville auto auction. Some cars were sold to other Ford franchise dealers and some remain unsold. There was a reduced public demand for new cars during the spring and summer of 1979. High levels of inventory were maintained by many Ford dealers and the disposition of the Vinson Motor inventory was more protracted than anticipated. Losses occurred on the sale of some of the vehicles. Except for its failure to send notice to the debtor and the plaintiff, the manner of disposing of the Vinson Ford

inventory was in compliance with the procedures customarily followed by defendant when it liquidated a dealer's motor inventory. In attempting to dispose of the vehicles, defendant wrote letters to 70 Ford dealers served by the Nashville branch office of defendant. The vehicles were sold to dealers submitting the highest bid. All but six were sold within $100 of the dealer's wholesale price.

Defendant asserts that the method of disposition of the Vinson inventory resulted in commercially reasonable sales. In particular, the defendant claims compliance with the provisions of T.C.A. § 47–9–507.

Since this case was submitted on stipulation of facts the court will list some facts which it does not judicially know and about which the defendant has offered no evidence:

(1) What is a recognized market; was there a recognized market for these motor vehicles; and was the collateral sold in any recognized market?

The court notes that a number of decisions have held that, while a stock market or a commodities market are recognized, there is no recognized market for used cars. *Norton v. National Bank of Commerce*, 240 Ark. 143, 398 S.W.2d 538, 3 UCC Rep.Serv. 119 (1966); *Family Finance Corp. v. Scott*, 24 Pa.C. & D.2d 587, 1 UCC Rep.Serv. 647 (1961). Other courts have reached the opposite conclusion that automobiles are customarily sold on a recognized market. *Abbott Motors, Inc. v. Ralston*, 28 Mass.App. Dec. 35, 5 UCC Rep.Serv. 788 (1964). In *Mt. Vernon Dodge, Inc. v. Seattle-First National Bank*, 18 Wash.App. 569, 570 P.2d 702 (1977), the court referred to "new and used cars, trucks, and campers [as] items [which] are customarily sold in a recognized market and are the subject of widely distributed standard price quotations." *Id.* at 712.

The question does not appear to have been passed upon in Tennessee.

White and Summers are of the opinion that the sale of "hard goods" and any other "transaction which involves haggling over price or competitive bidding should not be considered as one conducted on a recognized market, and the secured party is properly relieved of his obligation to give notice of resale only where neutral market forces rather than negotiation between buyer and seller determine price." White and Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 26–10, at 984 (1972).

(2) What are and were the reasonable commercial practices among dealers for inventory liquidation or vehicle sales?

(3) Did the offering of the vehicles to a limited number of franchised Ford dealers destroy the concept of commercial reasonableness?

(4) Was the sale through the Nashville auto auction a sale which was commercially reasonable, i. e., was such sale customary and acceptable in inventory liquidations and did the price normally received meet the community standards for the disposition of vehicles?

■ The law in Tennessee is that, in order to be commercially reasonable, these dispositions must be in keeping with the prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or similar business. *Investors Acceptance Co. v. James Talcott, Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130, 137–38 (1969), *cert. denied, id.* (1970); *Mallicoat v. Volunteer Finance and Loan Corp.*, 57 Tenn.App. 106, 415 S.W.2d 347, 350 (1966).

(5) Was the time over which the liquidation took place reasonable in determining whether the sale was commercially reasonable?

■ Since it is the policy of the U.C.C. to provide flexibility in the disposition of collateral, including the timing of the sale, in order to maximize the amount of proceeds realized therefrom, the time over which the liquidation took place must be considered. *See Brunswick Corp. v. J. & P. Inc.*, 424 F.2d 100 (10th Cir. 1970) *citing* 1 Coogan, Hogan, and Vagts, *Secured Transactions Under the Uniform Commercial Code*, § 8.04[2]; 2 Gilmore, *Secured Interests in*

*Personal Property,* § 44.5 (1965). *See also Ace Parts and Distributors, Inc. v. First National Bank,* 146 Ga.App. 4, 245 S.E.2d 314 (1978) (delay may be justified); *Nelson v. Armstrong,* 99 Idaho 422, 582 P.2d 1100 (1978) (delay may make sale commercially unreasonable).

(6) Did the heavy inventory among dealers have a direct impact on what constitutes a commercially reasonable sale?

██ The Code does not declare a fixed definition of commercial reasonableness but merely establishes guidelines. *Wilkerson Motor Co. v. Johnson,* 580 P.2d 505 (Okla. 1978), noted in Note, *Commercially Unreasonable Repossession Sales in Oklahoma*: *Wilkerson Motor Co. v. Johnson,* 13 Tulsa L.J. 820 (1978). In determining the issue, the court must consider the aggregate of all the circumstances surrounding the sale. *Associates Capital Services Corp. v. Riccardi,* 454 F.Supp. 832 (D.R.I.1978). This would certainly include a glut in the market.

(7) What factors militate in favor of wholesaling instead of retailing the inventory and what are the effects of the anticipated results upon a judgment of commercial reasonableness?

In *Hall v. Owen County State Bank,* 370 N.E.2d 918 (Ind.App.1977), it was stated:

Another factor which may be relevant is whether the collateral is sold on a retail or wholesale market. It is certainly true that a retail sale of goods will in most cases command a much higher price. However, a retail sale will usually generate considerably more expenses, such as reconditioning expenses, advertising expenses and sales commissions, insurance costs, etc., and usually will take much longer to consummate. This in turn may result in higher storage expenses and a higher interest accrual under the original obligation. Therefore, a sale to a dealer on the wholesale market will probably be the more reasonable approach in most cases.

*Id.* at 930.

There is nothing in the record from which a determination on this point may be made

and the court will not speculate as to the commercial reasonableness of wholesale versus retail in this case.

(8) Were the sales, as made, fairly conducted, i. e., was there any favoritism shown, collusion between seller and buyer, bad faith, deliberate sacrifice of a vehicle to make a rapid sale, etc., ad infinitum.

*See generally,* R. Anderson, *Anderson on the Uniform Commercial Code,* § 9–504:10 at 612–13 (1971), *citing Nelson v. Monarch Investment Plan,* 452 S.W.2d 375 (Ky.1970).

██ Although the court may draw inferences from the stipulated facts, this court cannot and will not infer that the basic thrust of the UCC sale-after-default provisions, i. e., a fair sale after reasonable notice, were met. This is particularly true in this case when Ford advised plaintiff orally of its intention to dispose of the collateral "as soon as possible" but gave no written or oral notice prior to private sales which extended over many months. Thus plaintiff received no notice of the time or place of any proposed private sale. In addition, plaintiff received no reasonable notification, in writing or orally, of a time after which an intended disposition would be made. The phrase "as soon as possible" when viewed in conjunction with the type of notice to proposed purchasers and the lapse of several months gave plaintiff no real opportunity to protect itself from loss. *See generally* T.C.A. § 47–1–201(26); White and Summers, *Handbook of the Law Under the Uniform Commercial Code,* § 26–10 at 983–87 (1972).

The court determines that Ford has not carried its burden of proving that the sales of inventory conducted by it were commercially reasonable.

It is ordered that this case is referred to the Magistrate, who shall hear evidence and determine:

(1) any losses resulting from the sales of the inventory by Ford,.

(2) what amounts were realized or should have been realized from the liquidation by Ford of the Vinson vehicle inventory, and

(3) the amount of the indebtedness owed by Vinson from October 30, 1974, to date.

The Master shall file a report with the Court.