**COMMERCE UNION BANK,**
**Plaintiff-Appellee,**

v.

**POSSUM HOLLER, INC., and Commissioner of the Department of Revenue,**
**Defendants-Appellants.**

Supreme Court of Tennessee.

Aug. 24, 1981.

Rehearing Denied Sept. 14, 1981.

Joe C. Peel, Asst. Atty. Gen., Nashville, for defendants-appellants.

Charles H. Warfield and Thomas P. Kanaday, Jr., Nashville, for amicus curiae, Jackson County Bank.

William W. Earthman, III, Nashville, for plaintiff-appellee.

John S. Bryant and Gerard Thomas Nebel, Nashville, for amicus curiae, Western Auto Supply Co.

## OPINION

DROWOTA, Justice.

Plaintiff-appellee, Commerce Union Bank, seeks a declaration of its rights to the proceeds of the sale of certain equipment and inventory of the debtor, Possum Holler, Inc. The primary issue concerns the priority of the conflicting liens held by the plaintiff and the Commissioner of Revenue. We are asked to determine, among other things, (1) whether a perfected security interest, securing all present and future indebtedness, has priority as to future advances over an intervening state tax lien and, (2) whether such security interest is limited to an amount equal to the indebtedness upon which the Tennessee recording tax was paid when the financing statement was filed.

This case was tried upon the stipulations of the parties filed with the trial court on March 26, 1980. The stipulations reveal that on January 13, 1976, Commerce Union Bank made a loan to Possum Holler, Inc. in the amount of $5,376.36. The parties entered into a security agreement and the bank's security interest was perfected by filing a UCC–1 form with the Tennessee Secretary of State's office on January 20, 1976. The security agreement contained a so-called future advance clause which provided that any future advances made by the bank to Possum Holler would be secured by the collateral described in the security agreement. The security agreement granted the bank a security interest in "[I]nventory and equipment now existing and hereinafter acquired." The UCC–1 was accompanied by an affidavit signed by a bank officer to the effect that the amount of the indebtedness was $5,376.38. Pursuant to T.C.A. § 67–4102, Item S, the bank paid an indebtedness tax of ten cents (10 cents) per one hundred dollars or major fraction thereof upon the indebtedness of $5,376.36 (no tax on the first $2,000.00). On April 30, 1976, the bank made Possum Holler a second loan evidenced by an installment note in the amount of $8,807.40. On June 24, 1976, the bank made Possum Holler a third loan evidenced by an installment note in the amount of $3,626.94. On September 29, 1976, the Commissioner of Revenue filed a Notice of State Tax Lien against Possum Holler for delinquent sales taxes. See, T.C.A. § 67–1808. The lien was filed in the Davidson County Registrar's Office and stated that the amount of the lien at the time of filing was $6,106.75. On November 30, 1976, the bank made another loan to Possum Holler in the amount of $17,712.86. From this sum $2,293.05 was applied to the remaining balance of the original $5,376.36 (January) loan, $6,591.77 was applied to the remaining balance of the $8,807.40 (April) installment loan, and $2,495.04 was applied to the remaining balance of the $3,626.94 (June) installment loan. Thus, $11,379.86 was used to consolidate the three prior loans and the remaining money disbursed to Possum Holler. The bank had Possum Holler execute another security agreement in connection with the $17,712.86 loan. This agreement gave the bank a security interest in equipment, fixtures, and inventory of Possum Holler. The bank perfected the security interest and paid the indebtedness tax on $17,712.86 at the time of filing. On April 22, 1977, the bank made another loan to Possum Holler in the amount of $40,-658.12. Possum Holler executed a security agreement in that amount which listed as collateral equipment, inventory, fixtures and 1,000 shares of Possum Holler stock. The bank timely perfected its security interest and paid the indebtedness tax on

$40,658.12. The deposition of the bank officer who handled the loan indicates that the account number assigned to the $17,712.86 loan was cleared from the bank's computer prior to April 22, 1977, possibly indicating that the $17,712.86 loan was paid off prior to the bank loaning the $40,658.12 in April of 1977. The stipulations of fact, however, signed by the parties more than four months after the deposition was taken, indicate that part of the $40,658.12 was applied to the remaining balance of the $17,712.86 loan and that Possum Holler has remained *continuously* indebted to the bank since January 13, 1976.[1] The bank made yet another loan to Possum Holler on August 24, 1977, in the amount of $5,378.68 in order for Possum Holler to buy a 1974 Cadillac limousine. The bank received a note and security agreement granting the bank a purchase money security interest in the Cadillac. The bank's security interest was perfected by having its lien noted on the automobile's certificate of title. On January 23, 1978, the Commissioner filed a second Notice of State Tax Lien for alcoholic beverage taxes. See T.C.A. § 57–4–301, formerly 57–157. The parties agreed that the Commissioner would sell the collateral and the parties would then litigate over the proceeds. A sale of the Cadillac netted $988.08. A sale of the inventory and equipment netted $23,598.40. The Chancellor awarded the proceeds of both sales to the bank.

The parties agree that the outcome of this priority dispute depends initially upon this Court's construction of T.C.A. § 67–1808 as it read at the time the tax lien was filed.[2] The statute provides that a tax lien, "... shall be inferior only to state and county ad valorem taxes and to existing liens created by contracts, but it shall be superior to any renewals of existing contract liens ...." Predictably then, the Commissioner takes the position that the bank had no "existing liens created by contract" at the time the state tax lien was

filed because at the time of filing the advances which the bank now seeks to recover had not yet been made. In the alternative, the Commissioner argues that even if the bank's January 1976 security agreement is an "existing lien created by contract" with respect to advances made after the filing of the state tax lien, the bank's consolidation of these loans is a "renewal" of an existing contract lien to which the state's tax lien is superior under T.C.A. § 67–1808. In addition, the Commissioner argues that the advances made by the bank after filing of the state tax lien are not within the purview of the future advance clause contained in the January 1976 security agreement. Finally, the Commissioner argues that any priority granted to the bank must be limited to the original $5,376.76 indebtedness because it was only upon this amount that the bank paid indebtedness tax prior to the filing of the tax lien.

We resolve each of these issues in favor of the bank and against the Commissioner.

■■■ We have been unable to find either in the Code or in our decisions a definition of the term "existing contract liens." In 1964 the Uniform Commercial Code became effective. Article 9 of the U.C.C. deals with secured transactions, sales of accounts, contract rights, and chattel paper. It applies "to any transaction (regardless of its form) which is intended to create a security interest in personal property ...." T.C.A. § 47–9–102. Since the statute in question was enacted several years after the adoption of the U.C.C. and since Article 9 of the U.C.C. is certainly the most comprehensive body of law dealing with the priority of creditors' claims in this jurisdiction, we find it appropriate to look to Article 9 in construing T.C.A. § 67–1808. Article 9 specifically authorizes the use of future advance clauses in security agreements and provides that a lender's priority as to all future advances will date back to the

---

1. Any conflict between the deposition of the bank officer and the subsequent stipulation of the parties must be resolved in favor of the stipulation.

2. T.C.A. § 67–1808 was repealed by Acts 1978, Ch. 686 § 5 and was replaced by T.C.A. § 67–6046.

time the original security agreement was filed. T.C.A. § 47–9–204(5); T.C.A. § 47–9–312(5). In this case the amount of the lien was established at $5,376.36 and the contract provided that future advances would also be secured by the collateral named therein. The issue may therefore be characterized as whether an existing contract can establish the priority of an advance to be made at a later date. Obviously, Article 9 allows for precisely that result and insofar as possible, T.C.A. § 67–1808 should be construed accordingly.

■ The Commissioner has characterized the November 1976 and April 1977 loan consolidations as Possum Holler "paying off" the prior loans. He, therefore, takes the position that these are renewals of contract liens and inferior to the previously filed tax lien. We cannot accept this characterization. According to the stipulations of fact, Possum Holler has been continuously and substantially indebted to the bank since January 13, 1976. Each time the bank consolidated Possum Holler's outstanding loans it also loaned additional money thereby increasing Possum Holler's total outstanding indebtedness. The fact that the bank filed a new "Note and Security Agreement" and obtained additional collateral each time the loans were consolidated does tend to support the Commissioner's position. The bank officer in charge of the account explained, however, that repeated use of the form entitled "Note and Security Agreement" was helpful in seeing to it that the indebtedness tax was timely paid. As to the additional collateral, the bank does not seek a priority claim on the proceeds of the additional collateral but only upon the collateral described in the original January 1976 security agreement.[3] We cannot deny, however, that these actions on the part of the bank support the Commissioner's position that a renewal occurred. It is simply that these facts alone do not outweigh the fact that Possum Holler remained continu-

ously indebted to the bank and progressively increased the amount of total indebtedness as time passed.[4]

■ Next, the Commissioner argues that future advances were not contemplated by the parties and therefore the bank is not entitled to rely on the future advance clause in the original security agreement. That clause provides that the named collateral will secure ". . . any and all other liabilities of Debtor to Creditor, direct or indirect, absolute or contingent, now existing or hereafter arising." Both the original loan and each of the subsequent loans were used by Possum Holler in its business as would naturally be contemplated by the parties. Cf., In Re White Plumbing and Heating Co., 6 U.C.C.Rep. 467 (E.D.Tenn. 1969). Therefore, based upon the clear language of the security agreement and the circumstances surrounding the transaction, we hold that the bank is entitled to rely on the future advance clause contained in the original security agreement.

■ Finally, the Commissioner takes the position that the amount of the bank's first priority claim should be limited to the amount upon which the bank originally paid indebtedness tax. The Commissioner relies heavily upon In re HGS Technical Associates, Inc., 14 U.C.C.Rep. 237 (E.D.Tenn. 1972), aff'd 14 U.C.C.Rep. 247 (E.D.Tenn. 1973) and Jackson County Bank v. Ford Motor Credit Company, 488 F.Supp. 1001 (M.D.Tenn.1980). The bank cites Genn v. CIT Corporation, 40 Md.App. 516, 392 A.2d 1135 (1978), in support of its contrary position. HGS Technical Associates, supra, is distinguishable from the case at bar because the court based its limitation of the secured party's first priority claim upon a representation appearing on the face of the financing statement. Since no representation as to the amount of the indebtedness is contained in the bank's January 1976 financing statement, the rationale of the HGS case does not apply here.

---

**3.** Obviously, the additional collateral is worthless.

**4.** We are not prepared to say that we would never characterize a transaction as a renewal

as long as the debtor remained continuously indebted to the creditor, only that we choose not to on these facts.

On the other hand, *Jackson County Bank, supra,* and *Genn, supra,* are relevant and represent different approaches to the same issue. In *Jackson County Bank* the defendant, Ford Motor Credit Corporation, filed a financing statement in October of 1974 and paid the Item S tax on $100,-000.00. The plaintiff bank filed its financing statement in August of 1976. In September of 1978, Ford filed a supplemental affidavit to the effect that the secured debt was $225,000.00 and paid the additional Item S tax thereon. During the time between Ford's filing and Jackson County Bank's filing, the indebtedness due Ford ranged from $110,100.00 to $328,400.00. During the period between the bank's filing and Ford's filing of the supplemental affidavit, the indebtedness reached a high of $447,000.00. At the time Ford filed its supplemental affidavit, the indebtedness was $301,650.00 and later reached a high of $616,300.00. The District Court held that Ford was estopped from claiming first priority for debts in excess of $100,000.00. In *Genn,* the secured creditor paid Maryland's recordation tax on $267,100.20 rather than the true amount of indebtedness which was $519,610.23. The court held that the secured creditor's first priority claim should not be limited to the amount upon which it paid the recordation tax. The *Jackson County Bank* court analyzed a number of Tennessee decisions and concluded that Ford's security agreement was an illegal contract and therefore not entitled to enforcement. The *Genn* court reasoned that since the financing statement is only designed to notify interested persons that the underlying transaction has taken place and that the particulars of the arrangement may be obtained from the named secured party, failure to pay the appropriate tax should not defeat an otherwise validly perfected security interest. The briefs of these parties and of two *amici curiae* have argued the relative merits of the approach taken by the *Jackson County Bank* court as opposed to the *Genn* court. After careful consideration, we have concluded that because of factual differences between the cases discussed and the case at bar, the issues resolved in *Jackson County Bank* and *Genn* are not properly reached in this case. In *Genn* and especially in *Jackson County Bank* the facts were such that a court could fairly infer that the failure to pay the proper tax was deliberate. In the case at bar, however, the bank paid additional tax when it made the $17,712.86 loan and again when it made the $40,658.12 loan. So not only did it pay additional tax as the amount of indebtedness increased, it actually overpaid the tax since both of these loans were in part consolidations of prior loans upon which the bank had already paid the tax. In our judgment, the bank made a good faith effort to comply with the indebtedness tax statute. In addition, since it is the Department of Revenue, rather than a subsequent secured creditor, who challenges the priority of the original secured party, it cannot be said that anyone detrimentally relied on the fact that between January and November of 1976 the bank had paid the tax on only $5,376.36. We hold, therefore, that the bank should not have its first priority limited to the amount upon which it paid the Item S tax in January of 1976.[5]

The final issue raised by this appeal is whether the bank's purchase money security interest should take priority over the state's tax lien. The Chancellor held it was protected even though it arose after the notice of tax lien was filed. We agree. T.C.A. § 67–1808 set forth what was to be included within a tax lien created thereunder: "all interests in property located in this state of the person against whom the same are assessed ...." The lien itself read: "Pursuant to the provisions of T.C.A. 67–1808, a lien exists in favor of the State of Tennessee upon all property and all rights, title and interest in property acquired ei-

---

5. Our holding is an implicit rejection of the rationale employed in *Jackson County Bank* to the effect that a security agreement is an illegal contract to the extent it secures advances in excess of the amount upon which the tax was paid. We do not intend to intimate, however, whether or not if faced with the same facts as *Jackson County Bank* we might reach on other grounds the same result reached by the Federal District Court.

ther prior to or subsequent to the filing of this notice, belonging to the hereinafter named taxpayer."

The bank's security interest in the automobile was, as noted, a purchase money security interest, taken by it in order to enable the debtor to acquire rights in the collateral. T.C.A. § 47–9–107. With this type of security interest, there is no period of time during which the debtor owns the collateral outright, as there might be with other types of security interests. In the present case, the sum loaned to the debtor was the entire purchase price of the automobile. Therefore, Possum Holler never had an interest in the automobile other than an equitable interest. That is, it never had an interest to which the tax lien could attach. No interest which could be attached or levied on "belonged to" the debtor. We do not feel that the tax lien purported, or could purport, to attach to an interest on the part of Possum Holler which was never more than an equitable interest.

We feel that this reconciles the language of § 67–1808 with T.C.A. Title 47, Chapter 9. We therefore hold that a purchase money security interest in collateral takes priority over a state tax lien arising under the former T.C.A. § 67–1808, since the only interest "belonging to the debtor" in such case is of an equitable nature. Consequently, the bank is entitled to the proceeds from the sale of the automobile.

We therefore affirm the Chancellor's award of the proceeds of the sale of equipment and inventory, and of the Cadillac, to the bank.

Affirmed and remanded.

HARBISON, C. J., and FONES, COOPER and BROCK, JJ., concur.