**AMERICAN CITY BANK OF TULLA-HOMA, Plaintiff-Appellee,**

v.

**WESTERN AUTO SUPPLY COMPANY, Defendant-Appellant.**

Court of Appeals of Tennessee, Middle Section.

Sept. 18, 1981.

Permission to Appeal Denied by Supreme Court April 12, 1982.

J. Stanley Rogers, Rogers and Parsons, Manchester, Tenn., for plaintiff-appellee.

Kenneth Ray Jones, Jr. and Gerard Thomas Nebel, Bass, Berry & Sims, Nashville, Tenn., for defendant-appellant.

Charles H. Warfield and Thomas P. Kanaday, Jr., Farris, Warfield & Kanaday, Nashville, Tenn., for Jackson County Bank.

Joe C. Peel, Asst. Atty. Gen., Nashville, Tenn., for Martha B. Olsen, Commissioner of Revenue, State of Tenn.

## OPINION

CONNER, Judge.

This case involves a dispute concerning the priority between two secured creditors claiming title to the same collateral under the Uniform Commercial Code. It raises issues concerning: (a) the sufficiency of filing a financing statement in a partnership name; (b) the effect of a misspelling in the name of the partnership debtor; (c) the necessity of amendment of the financing statement upon the initial creditor's ascertaining that there has been a change in the identity of the debtor in order to maintain priority over a subsequent creditor; (d) the reasonableness of the sale or other disposition of the involved collateral by the original creditor; and (e) the actual extent of the first filer's security interest based upon the effect of that creditor's failure to pay the applicable State of Tennessee privilege tax on the entire amount claimed by it as a priority.

### THE FACTUAL AND PROCEDURAL BACKGROUND OF THE DISPUTE

The defendant-appellant, Western Auto Supply Company,[1] entered into a purchase and security agreement with the partnership of Williamson, Knoer and York on June 9, 1977, authorizing the partnership to conduct business as a Western Auto dealer. Western Auto supplied financing for the partnership to purchase merchandise for the store and was granted a security inter-est in the store's inventory, accounts receivable, contract rights, chattel paper, fixtures and equipment.

The financing statement was filed with the secretary of state and the Coffee County Register of Deeds on June 17, 1977. The statement listed the debtor as:

Williamson, Kneer & York

Western Auto Associate Store

121 W. Lincoln

Tullahoma, Tn. 37388

The financing statement was signed by all of the debtor partners, W. A. York, Donald A. Williamson and George W. Knoer, but it was only indexed under "Williamson" in the secretary of state's office. On the financing statement filed with the secretary of state, the amount of indebtedness listed was $50,000.00, and the tax was paid on that amount only.

Subsequently, on September 1, 1977, York purchased the interest of his two partners and became the sole owner of the Tullahoma Western Auto store. Western Auto was made aware of the transaction at or about the time of its occurrence. York obtained a loan from the plaintiff, American City Bank, to finance this purchase. York gave to American City Bank a security interest in the store's inventory, accounts receivable, chattel paper, contract rights and general intangibles. He did not tell the bank of the previous partnership security interest granted to Western Auto. The plaintiff ran a verbal search with the secretary of state to see if there had been a prior security interest granted in York's collateral. This search did not pick up York as a debtor, since the previous filing had only been indexed in the partnership name. Thereafter, the bank perfected its security interest by filing a financing statement with the secretary of state on September 21, 1977, listing the debtor as:

W. A. York dba Western Auto

Associate Store # 16741

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

West Lincoln, Tullahoma, Tn. 37388

On November 1, 1977, the defendant amended its original financing statement that was filed with the secretary of state's office listing the debtor as:

York, W. A.

Western Auto Associate Store

121 West Lincoln

Tullahoma, Tn.

A like financing statement was filed with the Coffee County Register of Deeds on November 6, 1977.

In the meantime, York defaulted on his obligations to Western Auto and voluntarily surrendered the collateral to defendant on October 26, 1978. He had previously sold his accounts receivable totaling $30,700.00 to Thrift Loan Company (hereafter Thrift) on October 17, 1978, at a discount. There is little question but that this was the commencement date of York's liquidation despite Western Auto's protestations to the contrary. Although Western Auto did not directly participate in the sale of these accounts to Thrift, Western Auto consented to the sale and York did pay directly to Western Auto the $25,886.55 in proceeds from the Thrift sale in partial satisfaction of his indebtedness to it. After giving York credit for this amount, Western Auto was still owed $47,503.74.

On repossession, the defendant conducted an audit showing the book value of the inventory to be $53,779.40 and the value of the fixtures to be $12,000.00.

Western Auto quickly sold all of the toys and other seasonal goods in the inventory to the Western Auto Associate Store in Shelbyville on November 27, 1978, in anticipation of the Christmas season. Just over $7,000.00 in toys and other like goods brought $4,228.34, a discount of 39% from their book value.

Subsequently, by letter of March 9, 1979, Sam Sawyer, the then attorney for American City Bank, by letter to H. W. Sawyer, Western Auto's Wholesale Credit Manager, claimed that the bank had a prior right to the collateral and demanded payment of its secured indebtedness, $52,000.00. Four days later H. W. Sawyer returned a letter denying the bank's priority.

Later, on April 3, 1979, Gerard Thomas Nebel, attorney for the defendant, informed the plaintiff that Western Auto proposed to retain the balance of the collateral in satisfaction of York's remaining obligation to the defendant. It then totaled $46,914.43.

Thereafter, Western Auto sold the inventory and fixtures in one bulk package in November, 1979. The sale was for $44,235.74, equal to 74% of the book value of the collateral. The bank then sued Western Auto, demanding payment of its claim and an accounting, alleging that Western Auto's previously filed U.C.C. financing statement was fatally defective, that the bank had the only valid security interest in York's assets, and even if Western Auto had priority, in no event should the defendant's security interest exceed $50,000.00, the amount on which the privilege tax required by T.C.A. § 67–4102, Item S(b)[2] was paid.

2. *Transfers of realty and mortgages.*—
  (b) MORTGAGES, DEEDS OF TRUST AND OTHER INSTRUMENTS.—Prior to the public recordation of any instrument evidencing an indebtedness, including but not limited to ... financing statements contemplated by the Uniform Commercial Code ... there shall be paid a tax, for state purposes only, of ten cents (10¢) on each one hundred dollars ($100) or major fraction thereof of the indebtedness so evidenced.... In any case where the consideration or stipulation of indebtedness does not appear on the face of the instrument being offered for record, the recording official shall require a separate statement, to be made under oath, indicating the amount of the indebtedness so secured. This tax shall be paid to and collected by county registers, the secretary of state, and any other official who may receive any instrument ... for recordation in accordance with the laws of this state, and *registration is forbidden until such tax has been paid.* The incidence of the tax herein provided is declared to be upon the holder or owner of the indebtedness, evidenced by the instrument offered for recordation....

  *As used herein the word "indebtedness" shall mean the principal debt or obligation which is, or under any contingency may be, secured at the date of the execution of the instrument or at any time thereafter. If the principal indebtedness secured or which by any contingency may be secured is not determinable from the terms of the instrument, or if the instrument is*

The trial judge, without intervention of a jury, held that the defendant's financing statement did not comply with the requirements of T.C.A. § 47–9–402.[3] He said:

> ... [S]aid filing does not constitute a sufficient filing of said financing statement inasmuch as it contains serious omissions and errors which are seriously misleading, all because of the fault of the defendant, Western Auto Supply Company.

Having decided that the initial filing of the financing statement by defendant to have been insufficient, the trial court found that it was unnecessary to address the various other questions raised by the pleadings and the proof. Thus, he awarded the plaintiff judgment for $52,056.00, the amount of its purported secured indebtedness plus its filing fee. The defendant appealed.

With leave of court amicus curiae briefs were filed by the Jackson County Bank and Martha B. Olsen, Tennessee Commissioner of Revenue, on the question of the effect that T.C.A. § 67–4102, Item S(b), *supra*, might have on the validity of Western Auto's security interest as to any amounts beyond which the tax imposed by that statute was paid if this court were to otherwise determine the original filing to have been proper. Both amici curiae have vigorously asserted that Western Auto has no valid security interest for any amount beyond the $50,000.00 figure for which the tax was paid.

In the event we are unable to sustain the action of the trial court we have been urged by both plaintiff and defendant to decide all issues raised at trial necessary to finally dispose of the litigation.

We can review all of the issues presented by this appeal. T.R.A.P. 13(b).[4] Further, this court may give any judgment provided that it is not "in contravention of the province of the trier of fact." T.R.A.P. 36(a).[5]

given to secure the performance by the mortgagor, grantor, debtor or any other person of a *contract obligation other than the payment of a specific sum of money, and the maximum amount secured or which by any contingency may be secured is not expressed therein, such instrument shall be taxable upon the value of the property covered by the instrument.* The value of the property shall be determined by the receiving official charged with the duty of recordation and collection of the tax, unless, at the time of presenting the instrument, the owner thereof shall file a sworn statement of the maximum amount secured by the instrument. If such maximum amount is expressed in the instrument, or the aforementioned sworn statement, such amount shall be the basis of assessing the tax imposed under this item. (Emphasis supplied.)

**3.** *Formal requisites of financing statement—Amendments.—*

(1) A financing statement is sufficient if it is signed by the debtor and the secured party, gives an address of the secured party from which information concerning the security interest may be obtained, gives a mailing address of the debtor and contains a statement indicating the types, or describing the items, of collateral....

.    .    .    .    .    .

(3) A form substantially as follows is sufficient to comply with subsection (1):
Name of debtor (or assignor) ..........
Address .....................
Name of secured party (or assignee) .......
Address .....................
1. This financing statement covers the following types (or items) of property:
(Describe) .................

.    .    .    .    .

(4) The term "financing statement" as used in this chapter means the original financing statement and any amendments but if any amendment adds collateral, it is effective as to the added collateral only from the filing date of the amendment.

(5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

**4.** *Scope of Review.—*

(b) Consideration of Issues Not Presented for Review.—Review generally will extend only to those issues presented for review. The appellate court shall also consider whether the trial and appellate court have jurisdiction over the subject matter, whether or not presented for review, and may in its discretion consider other issues in order, among other reasons: (1) to prevent needless litigation, (2) to prevent injury to the interests of the public, and (3) to prevent prejudice to the judicial process.

**5.** *Relief; Effect of Error.—*(a) Relief to Be Granted; Relief Available.—The Supreme Court, Court of Appeals, and Court of Criminal Appeals shall grant the relief on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any

The facts of this appeal are not in material dispute. We are here dealing with questions of law and may render judgment on these issues without interfering with the factual province of the trial judge.

## THE VALIDITY OF DEFENDANT'S INITIAL FILING

■ The threshold issue raised is whether a financing statement filed in the name of a partnership complies with T.C.A. § 47–9–402, *supra*. In this regard we must respectfully disagree with the conclusions of the trial court.

Tennessee has adopted the system of notice filing:

> ... What is required to be filed is not, as under chattel mortgage and conditional sales acts, the security agreement itself, but only a simple notice which may be filed before the security interest attaches or thereafter. The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs....

T.C.A. § 47–9–402, Comment 2. Essentially, all that is required of the creditor is to file something publicly that will alert credit searchers to the existence of a security agreement. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 23–16 at 952 (2d Ed. 1980) (hereafter White & Summers).

To comply with T.C.A. § 47–9–402(3), *supra*, the name of the *debtor* must be supplied. "Debtor" is defined as the *person* who owes the payment of a secured obligation. T.C.A. § 47–9–105(1)(d).[6] The code defines person as including an individual or an organization. T.C.A. § 47–1–201(30).[7] Organization is expressly defined as including a *partnership*. T.C.A. § 47–1–201(28).[8] Thus, Tennessee's version of the Uniform Commercial Code expressly provides that a partnership can be a debtor. *See also In re Humphrey*, 12 U.C.C.Rep.Serv. 986, 988 (E.D.Tenn.Bankr., 1973), where Judge Bare held that a financing statement showing a partnership as the debtor met the requirements of the Uniform Commercial Code. Another court held the financing statement filed in the name of the partnership debtor was sufficient, because a debtor is a person, a person includes an organization, and an organization includes a partnership. *In re Holmes*, 9 U.C.C.Rep.Serv. 1160, 1162 (W.D. Mich.Bankr., 1971).

■ The plaintiff also asserts that the defendant's financing statement omitted the "dba" designation and was therefore defective. Had the "dba" designation been provided, the financing statement would also have been indexed under "Western Auto Associate Store." However, the general rule is that:

> Where the debtor is an individual or partnership, the filing is "sufficient" if it is in the individual or partnership name, despite the fact that it omits the assumed

---

relief, including the giving of any judgment and making of any order; provided, however, relief may not be granted in contravention of the province of the trier of fact. Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.

6. *Definitions and index of definitions.—*
(d) "Debtor" means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in the collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in

any provision of the chapter dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires;

7. *General definitions.—*
(30) "Person" includes an individual or an organization (See § 47–1–102).

8. *General definitions.—*
(28) "Organization" includes a corporation, government or governmental subdivision or agency, business trust, estate, trust, *partnership* or association, two or more persons having a joint or common interest, or any other legal or commercial entity. (Emphasis supplied.)

(d/b/a) name under which the business entity may be widely known. Note well that the subsection does not answer the converse question whether a filing in the assumed name might be sufficient. The section says only that filings in the actual individual or partnership name are sufficient, not that such filings are "necessary and sufficient." White & Summers, *supra* at 959.

Thus, Western Auto's failure to include the "dba" designation in its financing statement did not, in our opinion, render the filing defective.

There is substantial authority for the proposition that a filing under an assumed name only would be insufficient. *See In re Osborn*, 6 U.C.C.Rep.Serv. 227 (W.D.Mich. Bankr., 1969), where the court held that:

. . . the notice filing as intended by the drafters of the UCC . . . was not accomplished when the signature and name of the debtor on the financing statement was an assumed name. . . .

It was the *intent* of the drafters that the filing officer be furnished with a "name of the debtor" that could give reasonable notice that a security interest exists against a part of his assets. . . .

As mentioned above, any person may obtain a certificate for doing business under an assumed name. There is no limit for the number of assumed names that can be obtained. Some businessmen have a propensity for assumed names and may use a different one for each phase of their activities, adding and discarding as suits their desires. It is not unusual for a bankrupt to list four or more assumed names which he has used over the years. Therefore, if we would allow financing statements to be filed under assumed names, subsequent creditors and interested parties may be unduly mislead. An assumed name may be used in 1965 and discarded shortly thereafter and by 1969, even the debtor may have forgotten that he once used such a name. To allow filing under assumed names would place a burden on searching creditors and other interested parties not intended by those

who drafted the UCC. Certainly to require the use of the real name of the debtor meets one of the purposes of the Act, "to simplify, clarify and modernize the law governing commercial transactions". . . . *Id.* at 231, 232.

Had Tennessee adopted the 1972 version of the Uniform Commercial Code, the "dba" question would have been even more quickly resolved. Section 9–402(7) of the U.C.C. now provides:

A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or names of partners.

We view this code section, although unadopted in Tennessee, as highly persuasive of the intent of the framers of the U.C.C. This revision, if adopted, would eliminate some question still likely to be raised regarding the adequacies of filing. Though in the modern commercial world of changing ownerships and entities we think it is impossible to design reasonable legislation which will eliminate all the possible difficulties inherent in a "notice" system.

■ The plaintiff also asserts that Western Auto's financing statement is defective, because the name of one of the debtors on the original financing statement was misspelled. "Knoer" was actually spelled "Kneer."

The standard by which to judge the materiality of errors in the financing statement is found in T.C.A. § 47–9–402(5). It provides:

(5) A financing statement substantially complying with the requirements of this section is effective even though it contains minor errors which are not seriously misleading.

At trial, Nancy Bowen, director of the Uniform Commercial Code division of the Tennessee Secretary of State's Office, testified that the misspelling of Knoer would have no effect upon where this particular financing statement was indexed. The financing statement was indexed under "Williamson." Thus, no creditors would have been mislead by the location of the filing,

and no reasonable person could maintain that this partnership would have been mistaken for another, because of the misplacement of one letter in the name of Knoer. Accordingly, this error was not seriously misleading. This is also true as to any possible deficiency resulting from omitting the words "a partnership" at the end of the three listed names of the entity. Again, there could be no possible effect on the indexing. *Accord, see National Cash Register Co. v. Firestone & Co.*, 346 Mass. 255, 191 N.E.2d 471 (1963), holding that misspelling the word "Kozy" as "Cozy" was not seriously misleading. In *Beneficial Finance Co. of New York, Inc. v. Kurland Cadillac-Oldsmobile, Inc.*, 57 Misc.2d 806, 293 N.Y. S.2d 647 (Sup.Ct.1968), *rev'd on other grounds*, 32 App.Div.2d 643, 300 N.Y.S.2d 884, 6 U.C.C.Rep.Serv. 539 (Sup.Ct.1969), the misspelling of the debtor's first name as "Shelia" rather than "Sheila" was deemed not to render the financing statement seriously misleading.

The plaintiff cites *In re Brawn*, 6 U.C.C. Rep.Serv. 1031 (D.Me.Bankr.1969) as supporting the proposition that the spelling of "Knoer" as "Kneer" was seriously misleading. In that case, the debtor's name was *Brawn* and was spelled Brown on the financing statement. The court held that the financing statement served no purpose as a notice-giving instrument. While we agree with the holding of *In re Brawn*, it is easily distinguished from the case at bar. The debtor's name in the instant case was indexed as "Williamson;" thus, it really made no difference how the second partner's name was spelled. In the *Brawn* case the financing statement was indexed under Brown, burying the statement in the indexing system with numerous other listings under "Brown," causing it never to be found by subsequent creditors.

The U.C.C. is to be liberally construed and applied to promote its underlying purposes and policies, one of which is to provide a system of notice filing to perfect security interests. *In re Osborn, supra*, at 230. To require the use of the real name of the debtor only meets an additional purpose of the Code; that is "to simplify, clarify and modernize the law governing commercial relations." *Id.* at 232. Therefore, we hold that Western Auto fulfilled its duty under the Uniform Commercial Code by filing a financing statement in the name of the partnership despite the fact of a slight misspelling in one of the partner's names.

It is true that it would be virtually impossible for plaintiff to have determined the existence of a security interest by either a verbal or physical check of the U.C.C. filings with the secretary of state. However, it is equally true that had plaintiff been more prudent in its inquiries of York and/or the defendant prior to making a loan it certainly should have been able to learn of the existence and name of the previous partnership entity, "Williamson, Knoer and York." Surely plaintiff would not lend $52,000.00 as to which it required an extensive security interest without attempting to determine for what the funds would be used, what the original of the indebtedness might have been and to whom.

Indeed, George Vibbert, the president of American City Bank, testified:

Q. But you are aware, or you testified a moment ago that that $52,000 was the money used to buy out his partners?

A. *I assumed that.* My records don't indicate it, I did not handle that transaction. (Emphasis supplied.)

We can conjure numerous circumstances under which a creditor can perfect a U.C.C. security interest in personalty and a subsequent creditor not be able to discover it by the most careful search of the records of the secretary of state, e.g., a filing error by that office. Another basic example would be where A grants a security interest in goods to X, then unbeknownst to X, sells the goods to B who immediately gives a security interest to Y. Y is in an unfortunate position as it relates to X, having no knowledge of his existence or of his perfected security interest. However, X has priority over Y. There are other scenarios under which a properly filed financing statement under article 9 of the U.C.C. would not be discovered by a subsequent creditor relying

on the same goods previously hypothecated in extending credit.

Thus, it seems to this court that a prospective lender has a duty in the process to make inquiry of its proposed borrower sufficient to ascertain previous business dealings so as to allow a proper U.C.C. search—at least as between it and a prior holder of a security interest who has substantially complied with the "notice" filing requirements of the U.C.C.

## THE NECESSITY FOR AMENDMENT OF DEFENDANT'S FINANCING STATEMENT

The bank also argues that after learning of the identity of the new owner Western Auto did not amend its financing statement in sufficient time to preserve its priority. We disagree.

■ Under the current provisions of the Uniform Commercial Code as adopted in Tennessee, amendments to a financing statement are recognized, but not required under these circumstances. There is no express statutory duty placed upon a creditor in Tennessee to amend its previously filed financing statement when it becomes aware that the debtor has changed its name or identity from a partnership to a sole proprietorship. *See* T.C.A. § 47–9–402(4), *supra.* However, there is an overriding obligation to act in good faith that prevails throughout the Uniform Commercial Code. T.C.A. § 47–1–203.[9] Good faith, as defined by the code, "means honesty in fact in the conduct or transaction concerned." T.C.A. § 47–1–201(19).

Cases from other jurisdictions have come down on both sides of the issue, though the clear majority rule is that no amended filing is required. In *Continental Oil v. Citizens Trust & Savings Bank*, 397 Mich. 203, 244 N.W.2d 243 (1976), the court held that there was no such duty to amend. Thus, the secured party's perfected status was maintained without making any effort to amend. *See also In re Guaranteed Muffler*

*Supply Co.*, 27 U.C.C.Rep.Serv. 1217 (N.D. Ga.Bankr., 1979). There the court held that a secured party's interest in collateral did not become unperfected because the secured creditor had failed to change the name of the debtor on the financing statement when the debtor incorporated and sold its assets to the new corporation. In *Borg-Warner Acceptance Corp. v. Bank of Marin*, 36 Cal.App.3d 286, 111 Cal.Rep. 361, 13 U.C.C.Rep.Serv. 939 (1973), it was held that a new or amended financing statement is unnecessary to continue perfection when a debtor's identity changes. Further, a Michigan court held that a security interest remained perfected even after the debtor listed on the financing statement was divorced and re-assumed her maiden name. All of this was known to the secured party, and no amendment was filed. *In re GAC*, 11 U.C.C.Rep.Serv. 412 (W.D.Mich.Bankr., 1972).

But in *In re Kalamazoo Steel Process, Inc.*, 503 F.2d 1218 (6th Cir. 1974), the court relied on the same good faith obligation as is also enunciated in T.C.A. § 47–1–203, *supra*, to hold that once a debtor changed its name so that a diligent search of the index of financing statements would not disclose the prior lien, the interest was no longer perfected. In that case the secured party knew *at the time of extending credit* that the debtor planned to change its name. Nonetheless, the secured party filed in the original name only. This was determined not to be honesty in fact. This court agrees with that result, however, we believe *Kalamazoo Steel* is readily distinguishable from the case at bar. Since there is no indication that Western Auto was aware of any likely change of name or ownership at the time the credit was here extended and the original filing made, *Kalamazoo Steel* would be of little benefit to the plaintiff.

To solve this dilemma of whether to require the filing of an amendment upon a significant change of identity of the debtor, the 1972 version of the Uniform Commercial Code now provides:

---

9. *Obligation of good faith.*—Every contract or duty within chapters 1 through 9 of this title imposes an obligation of good faith in its performance or enforcement.

... Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed finance statement becomes seriously misleading, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than *four months* after the change, unless a new appropriate financing statement is filed before the expiration of that time.... (Emphasis supplied.)

This amendment has not been adopted in Tennessee, but it does shed some insight into the commercial reasonableness and "honesty in fact" of Western Auto in the instant case. Here, the defendant filed its amendment within two months after York became the principal debtor. Although we hold that under these facts this amendment was not absolutely required to preserve Western Auto's priority under existing Tennessee law, we are satisfied that such filing clearly met the Uniform Commercial Code's standard of good faith. Thus, the defendant's priority continued.

### THE COMMERCIAL REASONABLENESS OF DEFENDANT'S DISPOSITION OF THE COLLATERAL

Further, the bank contends that Western Auto's disposition of the collateral was not in a commercially reasonable manner and thus, created a cause of action in its favor. We disagree.

■ Upon default, a secured party has three options. First, it may reduce the claim to judgment, foreclose or otherwise enforce the security interest by judicial procedures pursuant to T.C.A. § 47–9–501(1), (2), (3), (4), (5).[10] Second, it may repossess and sell the collateral in satisfaction of the obligation. T.C.A. § 47–9–504(3), *infra.* Finally, the creditor may propose to retain the collateral in satisfaction of the obliga-

---

10. *Default.—Procedure when security agreement covers both real and personal property.* —(1) When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part and except as limited by subsection (3) those provided in the security agreement. He may reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure. If the collateral is documents the secured party may proceed either as to the documents or as to the goods covered thereby. A secured party in possession has the rights, remedies and duties provided in § 47–9–207. *The rights and remedies referred to in this subsection are cumulative.*

(2) After default, the debtor has the rights and remedies provided in this Part, those provided in the security agreement and those provided in § 47 9 207.

(3) To the extent that they give rights to the debtor and impose duties on the secured party, the rules stated in the subsections referred to below may not be waived or varied except as provided with respect to compulsory disposition of collateral (subsection (1) of § 47 9 505) and with respect to redemption of collateral (§ 47 9 506) but the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable:

(a) subsection (2) of § 47 9 502 and subsection (2) of § 47 9 504 insofar as they require accounting for surplus proceeds of collateral;

(b) subsection (3) of § 47–9–504 and subsection (1) of 47–9–505 which deal with disposition of collateral;

(c) subsection (2) of § 47–9–505 which deals with acceptance of collateral as discharge of obligation;

(d) § 47–9–506 which deals with redemption of collateral; and

(e) subsection (1) of § 47–9–507 which deals with the secured party's liability for failure to comply with this Part.

(4) If the security agreement covers both real and personal property, the secured party may proceed under this Part as to the personal property or he may proceed as to both the real and the personal property in accordance with his rights and remedies in respect of the real property in which case the provisions of this Part do not apply.

(5) When a secured party has reduced his claim to judgment the lien of any levy which may be made upon his collateral by virtue of any execution based upon the judgment shall relate back to the date of the perfection of the security interest in such collateral. A judicial sale, pursuant to such execution, is a foreclosure of the security interest by judicial procedure within the meaning of this section, and the secured party may purchase at the sale and thereafter hold the collateral free of any other requirements of this chapter. (Emphasis supplied.)

tion. T.C.A. § 47–9–505(2).[11] There is nothing within the four corners of these provisions to indicate that these remedies are mutually exclusive. Nor have we found any case law to that effect. To the contrary, T.C.A. § 47–9–501(1) *supra*, indicates that they are cumulative. However, the secured creditor is restricted by two standards. First, in exercising his rights upon default, the secured party is bound by the good faith requirement applicable throughout the Uniform Commercial Code. T.C.A. § 47–1–203, *supra.* The secured party must also exercise his rights on default in a *commercially reasonable manner.* See T.C.A. § 47–9–504(3), *infra*, and T.C.A. § 47–9–507.[12]

▪ The bank claims that the partial sale of the Christmas toys and other seasonal items on November 27, 1978, was unreasonable because Western Auto gave no notice to the bank of the sale. T.C.A. § 47–9–504(3) provides that:

> (3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. *Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market,* reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. . . . (Emphasis supplied.)

We believe that this was precisely the kind of situation that the framers of the U.C.C. had in mind when the "threatens to decline speedily in value" exception was built into the code. *Accord, see* WHITE & SUMMERS, *supra*, at 1111:

> However, when the interests of the debtor would be better served by a quick resale or the fair market value can be established with certainty in the market place, notice need not be sent. Thus, the secured party is excused from giving notice of resale when the "collateral is perishable or threatens to decline speedily in value." Understandably, the time consumed in giving notice might have disas-

---

11. *Compulsory disposition of collateral—Acceptance of the collateral as discharge of obligation.—*

(2) In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor and except in the case of consumer goods to any other secured party who has a security interest in the collateral and who has duly filed a financing statement indexed in the name of the debtor in this state or is known by the secured party in possession to have a security interest in it. If the debtor or other person entitled to receive notification objects in writing within thirty (30) days from the receipt of the notification or if any other secured party objects in writing within thirty (30) days after the secured party obtains possession the secured party must dispose of the collateral under § 47 9 504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

12. *Secured party's liability for failure to comply with this Part.—*

(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two (2) preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable.

terous consequences on the price realized when the value of the collateral is subject to a sharp decline or the collateral is about to rot for want of refrigeration or other proper storage. Under such conditions the debtor will be better off in most instances if the secured party sells quickly and tells him about it later.

In this case, the proof was that had Western Auto not made this sale to its associate store in Shelbyville that the toys and related items would have been essentially worthless after Christmas. H. W. Sawyer explained the change in value of the seasonal products saying:

> For whatever it's worth, toys are devalued rather sharply in the weeks before Christmas. Toys that haven't moved, the cost to the dealer is devalued, and the dealer starts cutting his prices on any toys that he has in inventory, so the actual value of those toys on the market was going down sharply at that time.

To determine whether this sale was commercially reasonable we must consider whether the disposition is in keeping with prevailing trade practices among reputable firms engaged in similar business activities. *Investors Acceptance of Livingston, Inc. v. James Talcott, Inc.*, 61 Tenn.App. 307, 323, 454 S.W.2d 130, 138 (1969); *Mallicoat v. Volunteer Finance & Loan Corp.*, 57 Tenn. App. 106, 111, 415 S.W.2d 347, 350 (1966). Based upon the circumstances here presented we find that the sale of the goods was so in keeping and was indeed commercially reasonable inasmuch as their value would have been significantly diminished had they not been sold before Christmas.

■ Additionally, plaintiff argues that once Western Auto sold the Christmas inventory under T.C.A. § 47–9–504, *supra*, that the defendant no longer had the right to retain the balance of the collateral in satisfaction of the debt pursuant to T.C.A. § 47–9–505(2), *supra.* We disagree.

We find nothing in the Uniform Commercial Code to prevent a secured creditor from combining a private sale of part of the collateral with an election to retain the remaining collateral in full satisfaction of the indebtedness where circumstances dictate. So long as the creditor acted in good faith and in a commercially reasonable manner in the disposal of the collateral, we believe he may proceed along any one or more of his three options provided by the U.C.C.

To hold that these remedies are mutually exclusive, and that once any of the goods are disposed of by virtue of one method that is the only one which may be employed for the balance, would be harsh indeed. Such a result would bear no relationship to commercial reason. This is especially true in the instant case where only a portion of the goods would quickly decline in value—or in a situation where some, but not all, of the goods were perishable.

To take advantage of T.C.A. § 47–9–505(2), *supra*, a secured party in a senior position must send written notice of his intent to retain to the debtor and to any other secured creditor who has a security interest in the collateral unless the collateral is consumer goods. The secured party may then retain the collateral to satisfy the obligation unless the debtor or a secondarily secured party submits a written objection to this election within thirty days from the receipt of notice. In the instant case, Western Auto notified the plaintiff on April 3, 1979, that it intended to retain the collateral to satisfy the debt. The plaintiff did not pose any written objection to the retainage of the collateral by the defendant until some eight months later. Since no objection was made, the defendant could retain the collateral.

■ The plaintiff contends that its letter of March 9, 1979, to the defendant was a sufficient objection to Western Auto's retention of the collateral under T.C.A. § 47–9–505(2), *supra.* The letter reads in pertinent part as follows:

> Please be advised that I represent the American City Bank of Tullahoma, Tennessee, whose records indicate a financing statement was filed for record notice on September 21, 1977, against W. A. York, d/b/a Western Auto. It further appears

that a financing statement against this individual and in favor of your company was filed on November 1, 1977 (see attached).

As you well know, both these financing statements encumbered all inventory owned or subsequently acquired by Mr. York while doing business as a Western Auto Associates Store. However, due to the order of filing dates, it is evident that American City Bank had priority over this inventory. Notwithstanding this priority, on or about October 26, 1978, a voluntary surrender was made by Mr. York of this inventory pursuant to a Security Agreement with your company, dated October 6, 1977. This surrender of collateral was so accepted and the same was subsequently removed by your company. This disposition of the collateral was not consistent with the Uniform Commercial Code, which provides that a security interest is perfected by the filing of a financing statement by which priority is given to the initial statement covering the same collateral.

It is incomprehensible that your company, having notice of this priority in security, would totally ignore the favored lien of American City Bank and make disposition of the inventory as a rightfully secured party.

Now, therefore, take notice that the above stated actions of your company will not be tolerated, and further, that any and all collateral disposed of after October 26, 1978, is a direct violation of the statutory laws of this state.

American City Bank had a security interest in inventory up to the amount of $52,000.00, and would therefore demand that any portion of this amount so disposed of be remitted to them through this office. If this demand is not met forthwith, a suit will be filed in a court of proper jurisdiction to enforce the rights of my client relative to this matter.

The plaintiff's theory is not viable for two reasons. First, the plaintiff would not be allowed to "pre-object" to Western Auto's plan of disposition of the collateral. T.C.A. § 47–9–505(2), *supra*, states that the plain-

tiff's objection must be received "within thirty (30) days *from the receipt* of the notification." Thus, an objection *before* the defendant's notice would not meet the literal requirements of the statute. Secondly, even if a pre-objection were held to comport with T.C.A. § 47–9–505(2), *supra*, the plaintiff's letter of March 9, 1979, could in no way be considered as a specific objection to Western Auto's retaining the collateral in satisfaction of the obligation. Nowhere therein is that subject addressed. The letter was indeed a vigorous objection to Western Auto's claim of preference, but not an objection to the basis on which it intended to dispose of the subject collateral.

In any event we believe the entire "retention" question to be mooted by the manner in which we have decided the taxation question, *infra*. We are satisfied that Western Auto ultimately disposed of the balance of the collateral in a commercially reasonable manner as mandated by T.C.A. § 47–9–504(3) and T.C.A. § 47–9–507(2). *See also* WHITE & SUMMERS, *supra*, at 1105. We will require the defendant to account for the funds received from that and the two other dispositions previously discussed, but no more.

## THE QUESTION OF WHETHER THE SECURITY INTEREST IS LIMITED TO THE AMOUNT ON WHICH THE PRIVILEGE TAX IS PAID

■ The final issue presented by this appeal is whether a filed security interest is limited to the amount on which the Tennessee privilege tax for recording is paid.

We believe that in Tennessee no one may claim to be perfected by the filing of a security interest for any amount in excess of the privilege tax paid upon that filing. The payment of the privilege tax on filing financing statements is a condition precedent to filing. T.C.A. § 67–4102 Item S(b), *supra*, specifically states that registration of financing statements is forbidden unless the tax is paid *prior* to registration.

*Prior to* the public recordation of any instrument evidencing an indebtedness,

including ... financing statements contemplated by the Uniform Commercial Code ... there *shall be paid a tax* ... on each one hundred dollars ($100) or major fraction thereof of the indebtedness so evidenced....

.    .    .    .    .

... *[R]egistration is forbidden until such tax has been paid.* (Emphasis supplied.)

By its express terms, the statute prohibits anyone from knowingly and intentionally obtaining the physical registration of its financing statement without paying the required tax on the statutorily defined "indebtedness."

The term "indebtedness" is defined by T.C.A. § 67–4102 as:

... the principal debt or obligation *which is, or under any contingency may be*, secured at the date of the execution of the instrument or at any time thereafter. (Emphasis supplied.)

Thus, the statute imposing the tax on the privilege of filing financing statements provides that the appropriate tax must be paid on the *maximum* indebtedness which under any contingency may be secured by the filing.

Under the statute, in order to file the financing statement the filing creditor must honestly *stipulate* the maximum indebtedness to be secured. The creditor can stipulate the indebtedness on either the financing statement or on a separate sworn statement. The filing officer must calculate the tax on the *stipulated* amount and accept the financing statement for filing based upon this representation. The filing officer has no way to go behind these instruments.

The effect of the failure to pay the tax is clear on the face of T.C.A. § 67–4102, which expressly declares that a filing is *prohibited* unless the tax first be paid. As a result, we believe that the effectiveness of any financing statement as an instrument of priority is limited in that respect to the amount upon which the privilege tax is paid. Beyond that it is a nullity.

### The Mortgage and Lien Registration Analogy

██ This conclusion is identical to that of our courts which have held registration to be necessary to perfect or give effect to liens and conveyances. Mechanic's and materialmen's liens exist only by virtue of statute in Tennessee. Accordingly, in order to establish such a lien the statutory provisions relating to recordation must be strictly followed. *Tindell Home Center, Inc. v. Union Peoples Bank of Anderson County*, 543 S.W.2d 843, 844 (Tenn.1976); *Eatherly Construction Co. v. DeBoer Construction, Inc.*, 543 S.W.2d 333, 334 (Tenn.1976). *See In re Viking Co., Inc.*, 389 F.Supp. 1230, 1232–1233 (E.D.Tenn.1974), *aff'd*, 510 F.2d 974 (6th Cir. 1975). In seeking to perfect a lien where the creditor has failed to comply with statutory requirements, such as acknowledging the instrument prior to filing, the recordation has been uniformly held to be ineffective. *Pulaski Lumber Co. v. Harpeth South, Inc.*, 501 S.W.2d 275, 278 (Tenn. 1973); *Chattanooga Lumber & Coal Corp. v. Phillips*, 202 Tenn. 266, 276–277, 304 S.W.2d 82, 86 (1957); *McDonnell v. Amo*, 162 Tenn. 36, 41, 34 S.W.2d 212, 213 (1931); *Henderson v. Watson*, 25 Tenn.App. 506, 507–508, 160 S.W.2d 429, 430 (1942).

The supreme court specifically held in *Pulaski Lumber Co. v. Harpeth South, Inc., supra*, that where the recorded notice had been acknowledged but not verified as required by the statute, "the filing was a nullity and did not give notice." 501 S.W.2d at 279. Similarly, under the Tennessee chattel mortgage act, a predecessor of the U.C.C., an instrument that had not been properly acknowledged was held not to be legally registered even though it had been physically filed by the proper clerk. *Haynes v. State*, 213 Tenn. 447, 374 S.W.2d 394 (1964). *See further Howard v. United States*, 566 S.W.2d 521 (Tenn.1978).

Tennessee courts have taken the same position in mortgage registration cases. Thus, it has been held that the failure to comply with the conditions precedent to recording renders the physical registration of the instrument of no avail. The deed of

trust is as if it had not been entered in the records. *Galt v. Dibrell*, 18 Tenn. 146, 154–155 (1836). As the supreme court said in *Pennington v. Webb-Hammock Coal Co.*, 182 Tenn. 33, 36, 184 S.W.2d 47, 48 (1944), where the conditions precedent to recording—such as a proper acknowledgment—have not been met, the instrument is "not entitled to registration although it was spread on the books of the register's office...." *Ibid.* Because the instrument was "not entitled to registration," it did not serve as notice to other creditors. *Ibid.* *See Citizens' Bank of Jellico v. McCarty*, 99 Tenn. 469, 470–471, 42 S.W. 4 (1897); *Henderson v. McGhee*, 53 Tenn. 55, 57 (1871). The registration does not create priority even though the defective instrument is physically filed. *Henderson v. McGhee, supra* at 57.

In Article Nine of the U.C.C. the legislature has provided for certain privileges to be afforded creditors—but only if they take the statutorily prescribed steps. One prerequisite to obtaining the benefits of Article Nine (for those creditors who must file to perfect) is that the privilege tax must be paid. We do not believe that anyone may claim the benefits of the status of a secured party as against a creditor who has properly perfected his security interest where he knowingly fails to comply with the statutory requirements.

### Authority From Federal and Other Jurisdictions

In Alabama, where there is also a tax that must be paid before a financing statement can be filed, the attorney general has declared that the tax must be paid before the benefits of filing can be obtained. He found that under Alabama law the "Mortgage privilege tax must be paid to secure the benefit of placing on record the financing statement perfecting a security interest" in the debtor's property. *Opinion of the Attorney General of Alabama*, 4 U.C.C. Rep.Serv. 132, 135 (1967). *Accord, Opinion of the Attorney General of Florida*, 3 U.C.C. Rep.Serv. 546, 549–550 (1966).

Judge Kelley has held that the creditor was limited in its secured claim to the amount declared in its "Statement of Indebtedness" filed with the financing statement. *In re Core*, (E.D.Tenn.Bankr., opinion filed April 5, 1978). There the bank declared in the Statement of Indebtedness that the amount of the indebtedness was $2,000.00 and the transfer tax was calculated on that amount only. Nonetheless, when the debtor went into bankruptcy, the bank asserted a secured claim well in excess of $2,000.00. The bank based its claim on the unrestricted amount of indebtedness covered by its filed financing statement and its security agreement with the debtor. Judge Kelley rejected the bank's claim and held that the bank's security was limited to the $2,000.00, the amount that the bank had stipulated to be the maximum amount to be secured by its filing.

The court in *In re HGS Technical Associates, Inc.*, 14 U.C.C.Rep.Serv. 237 (E.D. Bankr.Tenn.1972), aff'd, 14 U.C.C.Rep.Serv. 247 (E.D.Tenn.1973), was dealing with a financing statement which covered present and after acquired accounts receivable. The financing statement indicated that the amount of indebtedness was $30,000.00. Subsequently, the accounts were liquidated for some $45,000.00. The court only allowed recovery of the $30,000.00 interest shown on the financing statement. The judge there said:

> ... Tennessee Code Annotated 47–9–402 in setting up the formal requirements of a financing statement nowhere requires that it contain the amount of the indebtedness secured, but, if an amount is placed thereon, it is a representation of fact and, if that representation is incorrect, the creditor should not be heard to complain. *Id.* at 245.

In affirming this decision, Judge Neese said that anyone who relied on the $30,000.00 statement of indebtedness would be seriously misled if such indebtedness were greater than the indicated amount. *Id.* at 248. *Accord, Ford Motor Credit Co. v. Ken Gardner Ford Sales*, 10 B.R. 632 (Bkrtcy.E.D.Tenn., 1981). For a contrary view, *see Genn v. CIT Corp.*, 40 Md.App. 516, 392 A.2d 1135 (1978).

The Oklahoma Supreme Court has held that the filing tax "is a tax upon the civil privilege of having such mortgage recorded, so as to be entitled to the benefits and exemptions of the laws of this state. . . ." *Trustees', Executors' & Securities Insurance Corp. v. Hooton,* 53 Okl. 530, 157 P. 293 (1915). *See also Henderson Few & Co. v. Rollins Communications, Inc.,* 148 Ga.App. 139, 250 S.E.2d 830 (1978); *Greer v. Kooiker,* 312 Minn. 499, 253 N.W.2d 133 (1977); *Moore v. Todd,* 223 Ga. 702, 705, 157 S.E.2d 587, 589 (1967); *Greenwood v. Price,* 166 Okl. 292, 27 P.2d 822 (1933); *Kerschensteiner v. Northern Michigan Land Co.,* 244 Mich. 403, 221 N.W. 322 (1928); *Mutual Life Insurance Co. of New York v. Nicholas,* 144 App.Div. 95, 128 N.Y.S. 902 (1911).

The Kentucky Supreme Court has held that an instrument on which the tax is not paid will not operate as constructive notice, although it is left in the proper office for recordation. *Phillips v. Clark,* 61 Ky. (4 Met.) 348 (1863). The Supreme Court of Minnesota has held that a mortgage upon which the registry tax had not been paid was not entitled to be recorded and, if recorded, that the recordation did not give record notice of the instrument. *Orr v. Sutton,* 119 Minn. 193, 137 N.W. 973 (1912). The Supreme Court of Michigan has held that payment of the tax on only part of the amount secured gives constructive notice only as to the amount upon which the tax is paid. *Houghton v. Smith,* 258 Mich. 405, 242 N.W. 769 (1932). The cases cited in the last two paragraphs involve non-U.C.C. related taxing statutes. However, we believe the principle to be sound and the same. If one wants the benefits of recording statutes, one must pay the required tax.

### Policy Considerations

The defendant contends that the result we reach is too harsh despite analogous holdings in mortgage cases which have survived the test of time and identical treatment of the question by sister states which have adopted the U.C.C. and their own taxing statutes. Western Auto asserts that the statute is too limiting and ignores the realities of open-end financing. To the extent this presents a dilemma it is political, not judicial. The legislature has provided for the privilege of perfecting security interests by filing financing statements. Clearly that body is entitled to prescribe the conditions precedent that must be met to obtain legislatively conferred privileges. To obtain the benefits, creditors must bear the burdens and pay the required tax.

As a matter of public policy, those who violate the laws of this state should not be rewarded. Not only are the citizens and their state treasury short-changed, but the creditors who do pay the required tax are placed at a competitive disadvantage. Unscrupulous lenders can afford not to charge their customers for the privilege tax *because they do not pay it.* Tax-paying creditors, who generally pass along the tax, may be thus thrust unfairly into a severe competitive squeeze. Fairness requires that we deny rewards to those who ignore the requirements of obtaining the privilege of filing.

Further, the only real way of enforcing this tax is by refusing to give the benefits of priority to those who are found to have not paid it as they should, absent implementation by the state of an audit program so costly as to likely obviate the benefit of the tax. The action of the legislature has made the tax a self-enforcing one. When a secured party knows that a security interest will be protected only to the extent of the tax paid, that party will then see to it that the correct tax is paid in all likelihood. This is because the creditor's purpose in filing is for self-protection in case the debtor defaults. On the other hand, if we were to interpret the statute as defendant suggests, we would encourage creditors to use whatever devices might be available to them to pay little or no tax.

### The Legislative History

The legislative history of T.C.A. § 67–4102, Item S(b), clearly shows that the general assembly intended to forbid registration unless the required tax is paid. Initially, financing statements contemplated by the U.C.C. were not covered thereunder. Further, the tax that was due was calculat-

ed only on the existing indebtedness. The legislature amended the privilege tax statute specifically to include financing statements and to place the tax on the maximum indebtedness to be secured, whether the maximum existed on the filing day or arose later.

In 1963 the general assembly enacted the U.C.C., initially without amending T.C.A. § 67–4102, Item S, to include financing statements contemplated by the Code. However, in 1967 the legislature did amend Item S to include these financing statements. *See International Harvester Co. v. Carr,* 225 Tenn. 244, 466 S.W.2d 207 (1971). The Tennessee Attorney General explained the purpose of these amendments in an *Opinion* dated December 6, 1967:

> What must be further borne in mind here is that the original scope of Item S(b) has in recent years been eroded without any expressed intention to do so by the enactment of the motor vehicle title statute and the Uniform Commercial Code. These statutes provide new and different methods and places for the recordation of certain types of security instruments. One of the manifest objects of the amendments to Item S(b) was to bring these instruments back within the scope of the popularly referred to "mortgage tax." When we view the new statute against this background, it seems clear that the legislative intent was to include within the scope of the tax only those financing statements setting forth security interests in property which would have been subjects of taxation under the original Item S(b). These are those statements which can fairly be said to be substitutes for mortgages, deeds of trust and conditional sales contracts. *Opinion* at p. 2.

Even after these amendments, however, the attorney general emphasized that no means was provided for the ascertainment of anything "other than present interest in present property." Thus, a tax was due only upon the amount of indebtedness, if any, that existed on the filing date. Future indebtedness was not taxable as no means

had been provided for its ascertainment. *Ibid.*

In 1974 the general assembly again amended Item S(b), obviously in recognition of the discrepancy pointed out by the attorney general. For the purpose of fixing the amount upon which the privilege tax is due, the amendment defined "indebtedness" to include future as well as presently existing obligations.

> As used herein the word "indebtedness" shall mean the principal debt or obligation which is, or under any contingency may be, secured at the date of the execution of the instrument *at any time thereafter.* (Emphasis supplied.)

Thus, the "basis for ascertainment" absent from the 1967 amendments was provided for in the 1974 amendment.

The legislature's reason for enacting the amendment to define the term "indebtedness" is made crystal clear in the legislative history. In speaking to the senate, Senator Dunavant declared with respect to Item S(b) that:

> . . . The intent of this law was to tax the total amount of indebtedness contemplated at the time of recording. However in 1967, the Attorney General ruled that only indebtedness existing at the time of recording was subject to tax and that indebtedness arising after filing could not be taxed. Since the Attorney General's ruling *it has been possible to avoid the tax filing instruments which evidence only part of the intended indebtedness, or none at all, thereby paying less tax than contemplated by the law, or none at all. This permits debts incurred later or additional debt to avoid taxation.*
>
> *This Section seeks to insure taxation of the total amount of indebtedness contemplated at the time of recording.* It provides that if the amount of indebtedness cannot be determined from the instrument, the value of the property covered by the instrument is taxed, or if the owner of the property files a sworn statement indicating the maximum amount of indebtedness, the maximum amount is taxed. The tax is imposed only at the

time of recording. *The intent of this Section is not to create a new source of revenue, but to close the loophole which allows avoidance of the tax, and thereby thwarts the intention of the Legislature in enacting the law.* If this practice continues unabated, the State could lose an estimated $2,000,000.00 annually. (Emphasis supplied.) *Statement of Senator Dunavant with respect to Senate Bill No. 1417* (March 26, 1974).

After discussion of this amendment, it was unanimously passed by the senate and subsequently passed by the house. The legislative intention was expressly declared to be to close the "loophole" in the statute in order to assure that tax was paid on the *maximum* indebtedness to be secured, present and *future.*

In his 1967 *Opinion, supra,* the attorney general rejected the suggestion "that the application of the tax to the filing of the financing statement is contrary to the terms of the Uniform Commercial Code," a contention asserted by defendant. The attorney general properly noted that the U.C.C. does not exist in a vacuum, without reference to other statutes:

> ... The answer here is that Chapter 178 of the Public Acts of 1967 [—codified as part of T.C.A. § 67–4102, Item S(b)—] was enacted subsequent to the enactment of the Commercial Code, and its provisions have to govern in the case of any conflict between the two. While the Uniform Commercial Code is an important and far reaching statute, it does not enjoy the status of "super law." It was enacted by the legislature of this state, which body can repeal, amend or modify as it sees fit. *Opinion* at p. 3.

Obviously, a statute must be construed in connection with all others on the same subject. *Black v. State,* 154 Tenn. 88, 92, 290 S.W. 20, 21 (1927); *Faulker v. Nashville,* 154 Tenn. 145, 154, 285 S.W. 39, 42 (1926). It is the duty of the court in construing a statute to avoid a construction which will place one statute in conflict with another, and the court should resolve any possible conflict between the statutes in favor of each other, whenever possible, so as to provide harmonious operation of the laws. *Parkridge Hospital, Inc. v. Woods,* 561 S.W.2d 754, 755 (Tenn.1978).

Here, we believe the U.C.C. and T.C.A. § 67–4102 Item S(b), are completely harmonious. The privilege tax statute sets forth the *precondition* to filing to perfect a security interest under the U.C.C. The Code specifies the contents of a financing statement and where it must be filed. Thus, the privilege tax statute *and* the Code provisions are entirely consistent. To successfully perfect a security interest by filing, we believe that one must both pay the required tax and comply with the requirements of the Code.

Although the U.C.C. was intended to standardize the law in the United States, it was recognized by the drafters that the *costs of registration would be locally prescribed:*

> It should be noted that many states have provisions relating to fees that depart from the Official Text of the Uniform Commercial Code. In fact, in all states the amounts of the various fees are prescribed locally. Therefore, it is essential that a secured party seeking to file should present the correct fee under the law of the state where the filing is to be made. A filing presented to the filing officer, which is not accompanied by the proper filing fee, will not be effective. 69 Am.Jur.2d, *Secured Transactions,* § 418 "Filing Fees" at p. 266 (1973).

In 4 *Anderson's Uniform Commercial Code* the authors declare that it is essential that a secured party seeking to file should present the required fees under the law of the state where the filing is to be had. "Presentation for filing of a financing statement and tender of the filing fee or acceptance of the statement by the filing officer constitutes filing under this article." *Ibid.* § 9.403 (1971). *See* 79 Supp. C.J.S., *Secured Transactions,* § 45, p. 47 (1974). Accordingly, the comprehensive standardization scheme of the Code is not injured by recognition of locally levied charges. These were clearly anticipated by the drafters.

*Compare, Opinion of the Attorney General of Oregon*, 14 U.C.C.Rep.Serv. 525, 528 (1974).

If need be, the Tennessee taxing statute may be considered as an amendment to the U.C.C.

As the supreme court held in the analogous case of a materialmen's lien dispute as to priority:

> ... [the lien] is altogether statutory, and, when the lawmaking body prescribes the terms upon which it may be asserted, it is beyond the power of this court to waive its provisions or substitute others. *McDonnell v. Amo*, 162 Tenn. 36, 41, 34 S.W.2d 212, 213 (1931).

Therefore, the financing statement cannot be considered filed until the tax imposed under Item S(b) has been paid. Registration of financing statements upon which the required tax has not been paid is prohibited.

Thus, the argument of Western Auto that T.C.A. § 67–4102, Item S(b) and the U.C.C. are mutually exclusive is incorrect. The statutes are clearly harmonious and necessarily interlocking. But if they were in conflict, Item S(b) would control because it was amended subsequent to the enactment of the U.C.C.

This is so since if there were an irreconcilable conflict between the provisions of two statutes, the provisions of the latter act must prevail. *Strader v. United Family Life Insurance Co.*, 218 Tenn. 411, 416, 403 S.W.2d 765, 767 (1966); *Southern Construction Co. v. Halliburton*, 149 Tenn. 319, 328, 258 S.W. 409, 412 (1924). *See Grundy County v. Dyer*, 546 S.W.2d 577, 580 (Tenn. 1977).

We believe the law is clear. To file the financing statement, the creditor must first truthfully *stipulate* the amount to be secured, and then pay a tax calculated on that amount. The statute expressly states that this must be done *prior to* registration. Otherwise, registration is *forbidden*. As Senator Ewell stated in the debate of the 1967 amendment on the Senate floor, the payment of the tax is the *prerequisite* to the recording of the instrument. *Debate on Senate Bill 107*, April 19, 1967.

Accordingly, if the tax is not paid, the prerequisite to filing is not met. Until all prerequisites are met, there is no "filing" in contemplation of law. Thus, a creditor who underpays the tax fails to perfect its security interest to an extent greater than the amount on which the tax was paid because its filing was effective only to the extent to which it truthfully stipulated the indebtedness and paid the tax.

This purpose has subsequently been recognized by our attorney general. In an *Opinion* dated February 15, 1979, he answered the question of the effect of the failure to pay the transfer tax imposed by Item S. With respect to both deeds—Item S(a)—and mortgages—Items S(b)—the Opinion declares that neither can be registered until the transfer tax has been paid. *Opinion*, at p. 3. The *Opinion* emphasizes that registration of instruments subject to both Item S(a) and S(b) is *forbidden* until the correct tax has been paid. *Opinion* at p. 5. Further, the attorney general explains that the term "indebtedness," which is the amount upon which the tax must be paid, means the maximum indebtedness to be secured or, if not determinable, then upon the value of the property secured. *Ibid.*

In an *Opinion* issued March 15, 1977, the attorney general cautioned that the deed of trust under consideration in that opinion contained a future advances clause. Thus, "the additional amounts [to be advanced] should be included in determining the amount of transfer tax pursuant to T.C.A. Section 67–4102, Item S(b) ..." he declared, quoting the definition of "indebtedness" added by the 1974 amendment. *Opinion of the Tennessee Attorney General*, March 15, 1977, at p. 2.

### The "Notice Filing" Argument

In the present case, Western Auto argues that since the U.C.C. has adopted the notice system of filing, the recordation taxing statute should not limit Western Auto's security interest to the amount of indebtedness upon which it paid the Item S tax.

We believe that the limiting effect of the recordation tax statute is consistent with the U.C.C. concept of notice filing.

The comments found under T.C.A. § 47–9–402 state the purpose of notice filing as follows:

> ... Notice filing has proved to be of great use in financing transactions involving inventory, accounts and chattel paper, since it obviates the necessity of refiling on each of a series of transactions in a continuing arrangement where the collateral changes from day to day....

The requirement that a binding maximum amount of indebtedness be stated is not inconsistent with this express purpose. The debtor does not have to refile every time his collateral changes or the amount of indebtedness fluctuates as long as the amount of indebtedness does not exceed the declared maximum amount. In the event the indebtedness exceeds the declared amount, the taxpayer does not need to file anything more than an amendment to his financing statement increasing the amount of indebtedness. Even though instances where the creditor exceeds his stated maximum line of credit should be rare, the creditor can bring the excess amount into the same priority as his original filing by having a "future advances" clause and paying additional tax for that privilege. *See Commerce Union Bank v. Possum Holler, Inc., infra.*

The requirement for a statement of the amount of indebtedness is similar to the requirement under the U.C.C. for a description of the collateral, and no more restrictive. The description of collateral is required on all financing statements and a secured party is limited to the collateral he has described. T.C.A. §§ 47–9–402, 47–9–110. The collateral description is a part of notice filing as is the indebtedness declaration which we believe to be in like fashion consistent with the concept of notice filing.

#### The Effect of *Jackson County Bank* and *Possum Holler*

Finally, the recent decisions in *Jackson County Bank v. Ford Motor Credit Company*, 488 F.Supp. 1001 (M.D.Tenn.1980) *and Commerce Union Bank v. Possum Holler, Inc.*, 620 S.W.2d 487 (Tenn.1981) must also be addressed as regards the taxing question here presented.

The effect of failure to pay the privilege tax as to the entire amount claimed as secured debt was also directly at issue in *Jackson County Bank*. In that case Ford Motor Credit Company filed a financing statement and paid the Item S tax on $100,000.00. Thereafter, the plaintiff bank filed its financing statement. Two years later, Ford filed a supplemental affidavit saying that the secured debt was $225,000.00. Concurrently, Ford paid the additional Item S tax. Between Ford's filing and the bank's filing, the amount owed Ford ranged from $110,000.00 to $328,400.00. Between the bank's filing and the supplemental filing by Ford, the indebtedness reached a high of $447,000.00. Judge Morton held, as does this court, that the knowing failure to pay the privilege tax, imposed as a precondition to filing, is a bar to the perfection of a security interest in any amount greater than that as to which the tax is paid. He only allowed recovery in the amount of $100,000.00, as listed on the initial financing statement.

Judge Morton held that T.C.A. § 67–4102 applies to the failure to pay the privilege tax imposed by T.C.A. § 67–4102, Item S(b). This provision declares in pertinent part that:

> It shall be unlawful for any person to exercise any of the privileges made taxable by Chapters 40 to 43, inclusive, of this title before complying with the provisions thereof. Anyone exercising any of said privileges without first paying the tax or without complying therewith shall be guilty of a misdemeanor and liable for a fine of not less than five dollars ($5.00) for each day such privilege is exercised without a license, which fine shall be in addition to any other penalties herein imposed....

The recurring penalty imposed by the statute is expressly declared to apply to the provisions of Title 67, Chapters 40 through 43 *inclusive*. Item S(b) of § 67–4102 falls within these parameters.

The distinguished district judge further held that when the recurring penalty of

§ 67–4102 applies to a claim, that claim is unlawful and unenforceable. In reaching this conclusion the court discussed a wide sampling of these cases. *Jackson County Bank v. Ford Motor Credit Company, supra,* at 1008–1009. Among them were *Bush Building Co. v. Mayor and Aldermen of Town of Manchester,* 189 Tenn. 203, 205, 225 S.W.2d 31, 32 (1949); *Stevenson v. Ewing,* 87 Tenn. 46, 47–48, 9 S.W. 230, (1888); *Freeman v. Thompson,* 600 S.W.2d 234, 236 (Tenn.App.1979); *Anderson v. Anderson,* 25 Tenn.App. 425, 427–428, 158 S.W.2d 374, 375 (1941). *See also Mascari v. Raines,* 220 Tenn. 234, 241, 415 S.W.2d 874, 877 (1967). In the decisions upon which Judge Morton relied the courts refused to aid the wrongdoer by not allowing him to establish his claim. A primary reason for this result is because the privilege taxes are "self-enforcing." As we have noted at pages 425 and 426, *supra,* usually one can escape proper payment of the privilege tax without detection—until he attempts to enforce or defend his claims. Thus, the functioning of the laws from an enforcement standpoint is dependent upon honest compliance therewith. Therefore, the court noted that in the past Tennessee courts have tended to reject those whose claims have been asserted without regard to their deliberate noncompliance with the taxing statute.

This decision is now on appeal to the sixth circuit by Ford.

In the *Possum Holler* case the Supreme Court of Tennessee was faced with a slightly different problem regarding the application of T.C.A. § 67–4102, Item S(b) and the priorities flowing therefrom. The court had to resolve the question of whether a perfected security interest as to all present and future indebtedness has priority as to future advances over an intervening state tax lien.

The plaintiff bank loaned the defendant $5,376.36 on January 20, 1976. The parties entered into a security agreement and the bank perfected its interest by filing. The bank paid the appropriate amount of Item S(b) tax on the amount loaned. The security agreement contained a "future advances" clause by which subsequent loans made by the bank would be secured by the collateral described in the security agreement. On April 30, 1976, the bank made a future advance of $8,807.40. A third loan for $3,626.94 followed on June 24, 1976. Thereafter, on September 29, 1976, a state tax lien was filed against Possum Holler for delinquent sales taxes. On November 30, 1976, the bank made another loan to the defendant for $17,712.86. Part of that loan was used to repay the three previous loans with the remainder going to the defendant. Another security agreement was executed for the amount. The bank perfected and paid the appropriate tax. On April 22, 1977, the bank made the defendant another loan of $40,658.12. Commerce Union again perfected its interest and paid the indebtedness tax on the amount. Yet another loan was made on August 24, 1977, for $5,378.68, and the bank perfected its security interest and remitted the levy. The supreme court determined that Possum Holler had "remained *continuously* indebted to the bank since January 13, 1976." (Emphasis in original.) On January 23, 1978, a second notice of state tax lien was filed against the defendant. Thereafter, all of the collateral was sold, and the chancellor awarded the proceeds to the bank.

Among other things, the commissioner of revenue argued that the bank should be limited to the original $5,376.76 indebtedness because the bank had paid the tax only upon that amount prior to the filing of the initial tax lien.

The supreme court through Mr. Justice Drowota's well-reasoned opinion resolved the question in favor of the priority of the bank. However, in that case as opposed to this case and *Jackson County Bank, supra,* the bank *paid* the additional taxes as and when new monies were lent to Possum Holler pursuant to the future advances clause of its security agreement. Or stated another way, the bank acted in complete good faith in an effort to comply with the taxing requirements of T.C.A. § 67–4102, Item S(b).

Mr. Justice Drowota compared the *Possum Holler* situation with *Jackson County Bank, supra,* and *Genn v. CIT Corp.,* 40 Md.App. 516, 392 A.2d 1135 (1978) relied upon by the bank in *Possum Holler* and Western Auto herein.

. . . *Jackson County Bank, supra,* and *Genn, supra,* are relevant and represent different approaches to the same issue. In *Jackson County Bank* the defendant, Ford Motor Credit Corporation, filed a financing statement in October of 1974 and paid the Item S tax on $100,000.00. The plaintiff bank filed its financing statement in August of 1976. In September of 1978, Ford filed a supplement affidavit to the effect that the secured debt was $225,000.00 and paid the additional Item S tax thereon. During the time between Ford's filing and Jackson County Bank's filing, the indebtedness due Ford ranged from $110,100.00 to $328,400.00. During the period between the bank's filing and Ford's filing of the supplemental affidavit, the indebtedness reached a high of $447,000.00. At the time Ford filed its supplemental affidavit, the indebtedness was $301,650.00 and later reached a high of $616,300.00. The District Court held that Ford was estopped from claiming first priority for debts in excess of $100,000.00. In *Genn,* the secured creditor paid Maryland's recordation tax on $267,100.20 rather than the true amount of indebtedness which was $519,610.23. The court held that the secured creditor's first priority claim should not be limited to the amount upon which it paid the recordation tax. The *Jackson County Bank* court analyzed a number of Tennessee decisions and concluded that Ford's security agreement was an illegal contract and therefore not entitled to enforcement. The *Genn* court reasoned that since the financing statement is only designed to notify interested persons that the underlying transaction has taken place and that the particulars of the arrangement may be obtained from the named secured party, failure to pay the appropriate tax should not defeat an otherwise validly perfected security interest. The briefs of these parties and of two *amici curiae* have argued the relative merits of the approach taken by the *Jackson County Bank* court as opposed to the *Genn* court. After careful consideration, we have concluded that because of factual differences between the cases discussed and the case at bar, the issues resolved in *Jackson County Bank* and *Genn* are not properly reached in this case. In *Genn* and especially in *Jackson County Bank* the facts were such that a court could fairly infer that the failure to pay the proper tax was deliberate. In the case at bar, however, the bank paid additional tax when it made the $17,712.86 loan and again when it made the $40,658.12 loan. So not only did it pay additional tax as the amount of indebtedness increased, it actually overpaid the tax since both of these loans were in part consolidations of prior loans upon which the bank had already paid the tax. In our judgment, the bank made *a good faith effort* to comply with the indebtedness tax statute. In addition, since it is the Department of Revenue, rather than a subsequent secured creditor, who challenges the priority of the original secured party, it cannot be said that anyone detrimentally relied on the fact that between January and November of 1976 the bank had paid the tax on only $5,376.36. We hold, therefore, that the bank should not have its first priority limited to the amount upon which it paid the Item S tax in January of 1976.[5] (Emphasis supplied.)

At the conclusion of the paragraph of the *Possum Holler* opinion above quoted Mr. Justice Drowota inserted the following footnote:

5. Our holding is an implicit rejection of the rationale employed in *Jackson County Bank* to the effect that a security agreement is an illegal contract to the extent it secures advances in excess of the amount upon which the tax was paid. We do not intend to intimate, however, whether or not if faced with the same facts as *Jackson County Bank* we might reach on oth-

er grounds the same result reached by the Federal District Court.

Not only does the defendant argue strenuously the rationale of *Genn, supra,* that the financing statement was filed pursuant to a notice statute only and therefore a failure to pay the full tax should invalidate no part of the security interest. It also argues that *Possum Holler, supra,* overrules *Jackson County Bank,* at least by implication. We do agree with defendant's interpretation that our supreme court is unwilling to say that when less than the full amount of tax is paid it will not deem the contract to be illegal, as did Judge Morton in *Jackson County Bank, supra.* However, we do not read *Possum Holler* to say that when the first secured creditor only alleges a security interest of a specified amount and pays the privilege tax thereon, that a bona fide second secured creditor who pays the proper tax is not entitled to priority above the maximum amount upon which the first secured creditor pays the tax.

To the contrary it seems to us that the supreme court is suggesting that if the proper tax is not paid and there is no excuse for non-payment which would allow the creditor to make a "good faith" argument such as existed in *Possum Holler,* that the *Jackson County Bank* result is likely correct. As pointed out in that opinion, third parties should be able to rely on the amount of the security interest claimed by a prior creditor as evidenced by amounts listed on financing statements and upon which the privilege tax is paid.

### Conclusion

The question to us where some, but not all, tax is paid by the first creditor is not whether the security agreement is an illegal contract. Rather, we believe the question is whether it is a filing under existing Tennessee statutory law entitled to priority over other bona fide secured creditors who have properly remitted the prescribed levy. For the reasons set forth herein we hold that except to the extent that the privilege tax

is paid there is no preference over other properly secured parties.

The privilege tax initially paid by Western Auto upon filing was $50,000.00. Since Western Auto paid no additional transfer tax above the initial amounts listed on those financing statements of June 17, 1977, it can only maintain priority as against plaintiff in that amount.

Accordingly, in view of all the circumstances of this multi-faceted case, we believe the proper method upon which to base an award to plaintiff is to subtract the $50,000.00 secured amount from the total monies ultimately received by defendant, with plaintiff entitled to the difference. The defendant received $25,886.55 from the sale of the accounts receivable to Thrift and $4,228.34 from the sale of the toys and other seasonal goods. It received $44,235.74 from the sale of the inventory and fixtures for a grand total of $74,350.63. With the priority $50,000.00 deducted, the plaintiff is entitled to judgment against Western Auto for $24,350.63, plus interest from October 17, 1979, the date the inventory and fixtures were finally sold.

The judgment of the trial court is modified as above stated. This cause is remanded for entry of a corrected judgment for plaintiff consistent with this opinion. The costs are taxed equally to the plaintiff and the defendant.

MODIFIED AND REMANDED.

LEWIS and CANTRELL, JJ., concur.